August F. Nielsen Co., Inc. v. Commissioner. Estate of Louis Miller, Deceased, Ruth Miller, Executrix and Ruth Miller v. Commissioner. Irving S. Wollins and Pearl Wollins v. Commissioner.
August F. Nielsen Co. v. Commissioner
Docket Nos. 690-64, 691-64, 2743-65.
United States Tax Court
T.C. Memo 1968-11; 1968 Tax Ct. Memo LEXIS 286; 27 T.C.M. (CCH) 44; T.C.M. (RIA) 68011; January 18, 1968. Filed Gerald A. Gleeson, Jr., 1421 Chestnut St., Philadelphia, Pa., for the petitioners in Docket Nos. 690-64, 691-64. Harry Geist, 341 Madison Ave., New York, N. Y., for the petitioners in Docket No. 2743-65. Kennard I. Mandell, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined income tax deficiencies of $5,372.91 and $4,387.93 against the petitioner August F. Nielson Co., Inc. (hereinafter referred to as the corporation), for the taxable years 1958 and 1959, respectively; deficiencies of $1,836.53 and $1,276.54 against petitioners Estate of Louis Miller, Deceased, and Ruth Miller, for *287 the taxable years 1958 and 1959, respectively; and deficiencies of $4,281.37 and $1,880.82 against petitioners Irving S. Wollins and Pearl Wollins for the taxable years 1960 and 1962, respectively. The petitioners Irving S. Wollins and Pearl Wollins have abandoned one of the issues raised in their pleadings. The issues remaining for decision are (1) whether the respondent erred in determining that the corporation did not qualify as a small business corporation under section 1371 of the Internal Revenue Code of 1954, and that it and its stockholders are therefore not subject to the provisions of subchapter S of the Code; and (2) whether the corporation is entitled to a deduction for general expenses for the taxable year 1958 in an amount in excess of the amount allowed by the respondent in the notice of deficiency. 45 Findings of Fact Some of the facts have been stipulated and the stipulations are incorporated herein by this reference. The Estate of Louis Miller is the successor in interest to the decedent Louis Miller. Louis and Ruth Miller were husband and wife who resided in Allentown, Pennsylvania, at the time the petition was filed. They filed *288 joint Federal income tax returns, on the cash method, for the taxable years 1958 and 1959 with the district director of internal revenue, Philadelphia, Pennsylvania. The petitioners Irving S. Wollins and Pearl Wollins, husband and wife, were residents of New York, New York, at the time of filing the petition. They filed joint Federal income tax returns, on the cash method for the taxable years 1960 and 1962 with the district director of internal revenue, Manhattan, New York. The corporation was incorporated in 1948 under the laws of the State of New York. Since 1949 its principal place of business, namely, its manufacturing plant, has been located in Bethlehem, Pennsylvania, and it has been engaged in the manufacture of infants' and children's wear. It also maintains offices in New York. It filed Federal income tax returns, on an accrual method, with the district director of internal revenue, Philadelphia, Pennsylvania. The corporation was formed in 1948 as the result of the pooling of business assets owned by Louis Miller and Irving Wollins with business assets owned by Harry Miller, a distant relative of Louis. At the time of its organization the corporation was authorized to issue *289 two classes of stock, consisting of 700 shares of Class A common stock, with a par value of $100 per share, and 1,400 shares of Class B common stock, with a par value of $100 a share. Of the Class A common stock authorized, 500 shares were issued to Harry Miller and 200 shares remained unissued. In consideration for the issuance of such stock, Harry Miller transferred to the corporation machinery, equipment, merchandise and cash at an accepted value of $80,000, which sum was originally carried on the corporation's books as a credit to the Class A capital stock account (in 1952 such account was reduced to $50,000 by a transfer of $30,000 from it to paid-in surplus). Louis Miller and Irving S. Wollins each received 500 shares of Class B common stock and 400 shares remained unissued. In consideration for the issuance of such stock, Louis and Irving transferred to the corporation machinery, equipment, fixtures, merchandise and cash at an accepted value of $100,000. This sum was credited to the Class B common stock capital account. The Class A and Class B common stock had the same rights in all respects except in the election of directors. Each class had the exclusive right to vote for *290 and elect two members of the board of directors. All of the issued stock was held in a voting trust. From January 1, 1949 to February 1, 1952, the board of directors consisted of Irving Wollins, Louis Miller, and Harry Miller and his wife. Louis and Harry Miller were engaged in the production end of the business, and operated from the corporation's manufacturing plant in Bethlehem while Irving Wollins was in charge of sales and purchases, and operated from the corporation's New York City office. Harry Miller contracted an ailment as a result of which he could not function actively in the conduct of the business. Accordingly, Louis Miller and Irving Wollins attempted to induce Harry to surrender his 500 shares of Class A stock to the corporation for redemption. Negotiations commenced in the summer of 1951. Harry, acting on the advice of his attorney, insisted that the purchase be made by Louis and Irving individually, that if he disposed of his stock to the corporation directly there might be some question as to his liability for previous corporate debts, liabilities or other penalties. At that time the corporation would not have been able to pay cash for the stock without impairing *291 its working capital necessary to cary on its operations. On February 2, 1952, Irving and Louis agreed to purchase and own in equal amounts, Harry's 500 shares of Class A common stock for $80,000. Payment for the stock was made by cancellation of debts owed by Harry to Louis and Irving in the sum (including accrued interest) of $5,462.50; payment of $54,537.50 in cash to him; and the delivery to him of a $20,000 negotiable, noninterest-bearing, 60-day promissory note signed by Irving and Louis. As part of the transaction, the voting trust was dissolved and all stock held under the voting trust was delivered to Louis anIrving. Also, at this time Harry entered into an agreement with the corporation regarding the cancellation of his employment contract and regarding other matters relating to his severance of all relations with the corporation, and he and his wife resigned as directors. In 1951 Harry had received compensation in the amount of $18.270 from the corporation. 46 At the time Irving and Louis acquired Harry's stock it was their intention to immediately transfer it to the corporation. On February 23, 1952, pursuant to a resolution adopted at a meeting of the stockholders *292 each of them did surrender and assign to the corporation the 250 shares of Class A common stock purchased from Harry, and each received therefor an unsecured negotiable promissory note from the corporation in the amount of $40,000, due October 31, 1953, bearing interest at the rate of 6 percent per annum. The notes were signed by Irving, as the corporation's president, and by Louis, as its secretary-treasurer. At such meeting it was also resolved that the 500 shares of Class A common stock be returned and the certificate of incorporation be amended to eliminate the 700 shares of authorized Class A common stock. On July 10, 1952, the certificate of incorporation of the corporation was amended to reduce authorized capital stock from $210,000 par value to $140,000 par value by eliminating the Class A common stock, to strike the provisions with respect to the designation of Class A and Class B common stock, and to provide that the amount of the authorized capital stock should consist of 1,400 shares of common stock of a par value of $100 per share. This resulted in the elimination of $50,000 from the capital stock account and $30,000 from the paid-in surplus account, and the reflection *293 on the corporation's books of a liability of $80,000 termed "notes payable - officers." The 500 shares of Class B common stock, which Irving and Louis each held were surrendered to the corporation and 500 shares of the newly authorized common stock were distributed to each of them in substitution therefor. At a special meeting of the stockholders and directors of the corporation held on December 15, 1952, it was resolved that the due date of the notes be extended from October 31, 1953 to October 31, 1954. This action was taken because Louis and Irving concluded that in view of the uncertainty of business conditions for the next year it was advisable to extend the time for payment by the corporation. Louis and Irving were issued new promissory notes for $40,000 each, bearing 6 percent interest, and due October 31, 1954. The notes were not paid on the due date although, by that time, $7,500 of principal had been paid on Irving's note and $4,000 of principal had been paid on Louis' note. Principal and interest due thereon were paid as follows: *14
Wollins Note
Miller Note
Year
Principal
Interest
Principal
Interest
1952
$ 2,200.00
$ 2,200.00
1953
$ 5,000
2,345.83
$ 2,500
2,400.00
1954
2,500
2,041.66
1,500
2,214.00
1955
11,000
1,657.52
9,000
1,697.00
1956
6,500
1,017.50
6,100
1,425.00
1957
5,000
740.00
1,254.00
1958 5,000
466.66
10,900
963.35
Total
$35,000
$10,469.17
$30,000
$12,153.35
*294 The above reductions in principal reflect in part cash payments made to Irving and Louis and in part offsets against their notes representing advances made to them by the corporation. After December 31, 1958, and to the present, no further payments of principal were made on either note, although interest continued to be accrued on the books of the corporation. In each year that payments were made on the notes, the corporation had current or accumulated earnings and profits equal to or greater than the payments made. The corporation has always found it necessary to continuously, except for a period each year, borrow from a bank, on a 30 to 90-day basis in order to provide needed working capital. Whenever it borrowed from the bank, the bank required that the notes payable to Irving and Louis be subordinated to the debts due the bank. The following tabulation reflects the financial status of the petitioner from the taxable year ended December 31, 1952 through the taxable year ended December 31, 1965, as shown by its balance sheets:
Taxable year
Excess of currentassets over currentliabilities
Taxable income
Accumulatedearnings
1952
$160,662.00
$20,085.04
$ 34,878.90
1953
211,417.49
4,509.80
37,384.48
1954
176,894.70
18,532.25
5 0,760.07
1955
170,726.56
15,627.15
61,468.96
1956
180,049.10
26,662.76
78,905.49
1957
196,592.36
27,092.24
95,337.80
1958
200,943.31
14,139.69
* 109,724.10
*295 47
Taxable year
Excess of currentassets over currentliabilities
Taxable income
Accumulatedearnings
1959
$191,249.36
$13,726.42
$100,682.92
1960
257,819.27
4,634.59
90,833.14
1961
381,581.86
29,228.43
* 121,624.98
1962
427,506.56
18,847.60
* 115,703.21
1963
384,679.70
15,833.00
* 120,253.68
1964
421,654.17
19,538.78
* 129,601.52
1965
428,114.91
20,795.57
* 135,925.31
During the years 1952 to 1962, inclusive, Irving and Louis each received salaries from the corporation as follows: Year
Salaries Paid toEach
1952
$18,480
1953
25,000
1954
26,000
1955
26,000
1956
30,240
1957
35,200
1958
33,980
1959
36,680
1960
36,400
1961
36,400
1962
36,400
From the date of incorporation to the present, the corporation has not declared or paid a dividend on its issued and outstanding common stock. During the year 1961 Irving and Louis each advanced $12,500 to the corporation, and the corporation's "Notes payable - officers" account was increased from $15,000 (principal remaining *296 unpaid on the above notes) to $40,000. However, in 1963 $20,000 was transferred from this account to the corporation's capital surplus account, and in 1964 $5,000 was so transferred, thus bringing the balance in the "Notes payable - officers" account down to $15,000. Irving and Louis felt that the above transfers were needed to provide necessary working capital for the corporation. Over the period February 2, 1952 to December 31, 1959, Irving and Louis were the sole stockholders of the corporation, and they consented to an election by the corporation to be taxed as a small business corporation under Subchapter S of the Code for the taxable years 1958 and 1959. During 1960 Anthony Wollins acquired 150 shares of the common stock held by Irving Wollins and added his consent to the corporation's Subchapter S election for the taxable year 1960. In 1961 Stanley Miller, Phoebe Epstein, and Walter Ostrow each acquired 75 shares of the common stock held by Louis Miller and added their consents to the corporation's Subchapter S elections for the taxable years 1961-1965. In its returns for the taxable years 1958 and 1959 the corporation reported taxable income of $14,139.69 and $13,726.42, *297 but paid no income tax thereon because of its Subchapter S election. In the notice of deficiency sent to the corporation, the respondent determined that it did not qualify as a Subchapter S corporation for such taxable years, stating as follows: It has been determined that for your taxable years ended December 31, 1958 and December 31, 1959, you are subject to the tax imposed by section 11 of the Internal Revenue Code of 1954. You do not qualify for tax treatment under Subchapter S of the 1954 Code, since promissory notes you issued to Louis Miller and Irving Wollins, your sole stockholders, purporting to be debt obligations were actually stock and constituted a second class of stock. Reg. Sec. 1.1371-1(g). In addition, the respondent disallowed deductions of $1,430.01 and $900 claimed by the corporation for the taxable years 1958 and 1959, respectively, as interest on the notes. [1] He also disallowed, to the extent of $2,340, a claimed deduction for general expenses in the amount of $6,593.78, on the ground that "no amount in excess of $4,253.78 was incurred or paid by you for allowable general expenses." This amount of $2,340 which was disallowed represented *298 amounts drawn from the corporation by Louis Miller in the amount of $45 per week. Such amount was used by Louis to make small miscellaneous payments on behalf of the corporation, such as tips to truck drivers to assure proper deliveries, to entertain visitors to the plant, and to pay bus fares of persons applying to the corporation for employment. In his return for the taxable year 1958 Louis Miller reported interest income from his note in the amount of $963.35. In the notice of deficiency the respondent 48 determined that the total amount of $11,863.35 received by Louis from the corporation in 1958 with respect to his note constituted taxable dividends. In 1958 and 1959 the corporation made distributions to Louis Miller in the respective amounts of $500 and $10,230.68, each denominated "nondividend distributions" by it as a small business corporation. Louis did not report these amounts as income. In the notice of deficiency the respondent determined that these payments constituted taxable dividend income to *299 him, since the corporation did not qualify under Subchapter S. Consistently, the respondent reduced the income reported by Louis for the taxable years 1958 and 1959 by the respective amounts of $7,069.84 and $6,968.22, representing his share of the corporation's undistributed taxable income for those years. In 1960 the corporation made a distribution to Irving Wollins totalling $10,500, consisting of a "nondividend distribution" in the amount of $7,500 and another distribution of $3,000. In 1962 the corporation made a "nondividend distribution" to Irving Wollins in the amount of $10,824.15. Irving did not report these amounts as income. In the notice of deficiency the respondent determined that these payments constituted taxable dividend income to him, since the corporation did not qualify under Subchapter S. Consistently, the respondent reduced the income reported by Irving for the taxable years 1960 and 1962 by the respective amounts of $1,622.10 and $6,596.66, representing his share of the corporation's undistributed taxable income for those years. For the taxable year 1962 the respondent also decreased the reported interest income by the amount of $750, since such amount had *300 been included by the respondent in the above amount of $10,824.15. Opinion The principal issue presented is whether the corporation qualified during the taxable years in question as a "small business corporation" within the intendment of section 1371 of the Internal Revenue Code of 1954, which defines the term as a corporation which, among other requirements, does not have more than one class of stock. The respondent contends that during the years in question the corporation did not qualify as a small business corporation since, he claims, the promissory notes of the corporation held in such years by Irving Wollins and Louis Miller represented a second class of stock. [2] The petitioners, on the other hand, contend that the notes constituted true indebtedness of the corporation and that hence the corporation had only one class of stock outstanding in such years. They further contend that even if the notes do not represent indebtedness they are not a second class of stock. *301 In 1952 the corporation had outstanding 1,000 shares of Class B common stock which were owned by Louis Miller and Irving Wollins equally, and 500 shares of Class A common stock which were owned by Harry Miller. Louis and Irving attempted to induce Harry to surrender his 500 shares of Class A common stock to the corporation for redemption, but Harry was unwilling to do this and insisted that the stock be purchased by Irving and Louis. Accordingly, Irving and Louis purchased such stock from him for $80,000, the greater portion of which was paid in cash or its equivalent and the remainder of which was represented by short-term notes. At the time they purchased the stock they intended to have the corporation redeem it from them. Accordingly, within about three weeks they surrendered the stock to the corporation for redemption. The corporation was unable to pay cash for the stock without impairing its necessary working capital and accordingly gave each an unsecured negotiable promissory note in the amount of $40,000, due October 31, 1953, bearing 49 interest at the rate of 6 percent per annum. Later in the same year the corporation's certificate of incorporation was amended to eliminate *302 the provision for two classes of stock and to provide for only one class of common stock, whereupon Louis and Irving surrendered their Class B stock for cancellation and each received in exchange therefor 500 shares of the new common stock. Thus, Louis and Irving were attempting to do indirectly what they were unable to do directly, namely, have the corporation redeem Harry's stock interest, and in this sense the notes might be considered as evidences of the corporation's intention to make distributions to them in amounts equal to the amount which they had paid to Harry for his stock. This, of course, does not mean that the notes represented true indebtedness for purposes of the application of the Internal Revenue Code. It is well established that in determining, for tax purposes, whether notes issued by a closely held corporation to its stockholders represent true indebtedness or an equity interest, the substance of the transaction and not its mere form is controlling. The question generally arises when stockholders have advanced funds to their closely held corporation, and the significant *303 factor is whether the funds were advanced with "reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business." Gilbert v. Commissioner, (C.A. 2) 248 F. 2d 399, and W.C.Gamman, 46 T.C.1. We are not satisfied from the record that there was a reasonable expectation that the notes could or would be paid at maturity regardless of the success or lack of success of the business. It appears from the testimony of Irving Wollins that the expectation of payment of the notes was based upon the hope that the corporation would have sufficient earnings to enable it to pay. His statement was that the "possibility was there, with a very good year of business, that we might be able to repay it within a year." The corporation had always found it necessary each year to borrow money from a bank to provide necessary working capital, and the notes in question were, at the insistence of the bank, subordinated to the bank's loans. Before the close of 1952 the due date of the notes was extended from October 31, 1953 to October 31, 1954, and they were not paid even on the date as extended. Payments were later made on the principal of *304 the notes over the years 1953 through 1958 as Irving and Louis considered it advisable, but as of the time of the trial the full amount of the notes had not yet been paid. Of significance is the fact that in 1961 Irving and Louis each advanced, in the form of loans, $12,500 to the corporation to provide working capital, and that in 1963 and 1964 such amounts were transferred on the corporate books to the capital surplus account since Irving and Louis felt that this was necessary to provide necessary working capital for the corporation. In view of the above, we think that the notes cannot be considered as representing true indebtedness. [3] Rather, we think they must be considered as representing an equity interest. However, the issuance of the notes did not confer on Irving and Louis any rights or interests which they did not already have by virtue of their nominal stockholdings. At that time the notes were held by them in direct proportion to their holdings of nominal stock. Had the principal amount owing to them remained proportionate to their holdings of nominal stock through the taxable years in question, the principle of W. C. Gamman, supra, would clearly be applicable. As stated *305 in that case "whatever preferences the notes gave them [the holders of the nominal stock] in the income and assets of the corporation, if enforced, were preferences only over themselves as stockholders," and such notes "would have to be considered a nullity insofar as they purported to give the petitioners [the holders of the nominal stock] any rights and interests in the income and assets of the corporation different from the rights and interests they had as owners of all the capital stock of the corporation." The respondent, however, maintains that since, due to disproportionate repayments of the principal of the notes, the amounts remaining due to Louis and Irving in the years in question were in the approximate ratio of two to one, the notes vested in them rights in the profits and assets of the corporation which were disproportionate to the rights and interests vested in them by the nominal stock; that hence the notes were in the nature of preferred 50 stock; that thus in the years in question the corporation had more than one class of stock within the meaning of section 1371; and that the Gamman case is not applicable. The respondent states that the disproportion is further *306 emphasized by the fact that in 1960 and 1961 Irving and Louis disposed of some of their nominal stock. The respondent relies upon the provisions of section 1.1371-1(g) of the Income Tax Regulations, set forth hereinabove in footnote 2. Such section provides that if an issuance, redemption, sale, or other transfer of nominal stock, or of purported debt obligations which actually represent equity capital, results in a change in the shareholder's proportionate share of nominal stock or his proportionate share of such purported debt, a new determination shall be made as to whether the corporation has more than one class of stock as of the time of such change. It is to be noted that the regulation does not state that it shall be considered that a corporation has more than one *307 class of stock in every instance where there has been a change in a shareholder's proportionate share of nominal stock or in his proportionate share of a purported debt which actually represents equity capital. It is true, of course, that Louis' note had not been paid to the extent that Irving's note had been paid and that as a consequence thereof it might be said that his note gave him a preferred claim over Irving with respect to the assets of the corporation. However, it was certainly not the intention to create a preferred interest, different from the interests represented by the nominal stockholdings, and in the final analysis the principal amount received by Louis and Irving as a result of the surrender of the Class A stock will be equal. It is apparent from the record that, despite the fact that they disposed of some of their stock, each continued, as a practical matter, to control the corporation equally. This is indicated by the fact that during 1961 each advanced an equal amount, $12,500, to the corporation in the form of loans, and by the fact that in 1963 and 1964 these amounts were transferred to the corporation's capital surplus account without any change in the nominal *308 stockholdings. Under the particular circumstances here presented, it is our conclusion that it should not be considered that during the years in question the corporation had a second class of stock within the intendment of section 1371 of the Code as a result of the change in the proportionate shares in the purported debt and in the nominal stock. We accordingly hold that the respondent erred in determining that the corporation did not, in the taxable years in question, qualify as a small business corporation, and in determining that it and its stockholders were not subject to the provisions of Subchapter S of the Code. The remaining issue concerns the respondent's partial disallowance of a deduction claimed by the corporation in the taxable year 1958 for "general expenses." The corporation claimed a deduction of $6,593.78 for such expenses. The respondent disallowed $2,340 of this amount of the ground that "no amount in excess of $4,253.78 was incurred or paid by you for allowable general expenses." Irving Wollins testified that each week Louis Miller, who was in charge of the factory, drew from the corporation by check $45 to make small miscellaneous payments on behalf of the *309 corporation, such as $5 or $10 tips to truck drivers to assure proper deliveries, small expenditures for entertainment of persons who visited the plant, and for paying bus fares for applicants for employment. He stated that the corporation interviewed 30 or 40 applicants per week and that Louis paid bus fares of 50 cents back and forth. Louis Miller had died before the trial of this case. The corporation's auditor testified that these checks were reflected in the books of account and that they totalled $2,340 for the year in question. He further testified that the revenue agent who examined the corporation's books advised him that this was the item which he was going to disallow ($45 X 52 weeks or $2,340). We are satisfied from the record that the amounts claimed were expended and that they constituted allowable ordinary and necessary business expenses. We accordingly disapprove the respondent's determination in this respect. Decisions will be entered under Rule 50. 51 Footnotes
*. Figures include undistributed Subchapter S income.↩
*. Figures include undistributed Subchapter S income.↩
1. The $1,430.01 deducted in 1958 was paid to Irving and Louis, while the $900 deducted in 1959 was accrued by the corporation but not paid to Irving and Louis.↩
2. The respondent refers to section 1.1371-1(g) of the Income Tax Regulations, as promulgated in T.D. 6904 (approved December 27, 1966), 1967-1 C.B. 219, which provides in part as follows: Obligations which purport to represent debt but which actually represent equity capital will generally constitute a second class of stock. However, if such purported debt obligations are owned solely by the owners of the nominal stock of the corporation in substantially the same proportion as they own such nominal stock, such purported debt obligations will be treated as contributions to capital rather than a second class of stock. But, if an issuance, redemption, sale, or other transfer of nominal stock, or of purported debt obligations which actually represent equity capital, results in a change in a shareholder's proportionate share of nominal stock or his proportionate share of such purported debt, a new determination shall be made as to whether the corporation has more than one class of stock as of the time of such change. The corresponding provision of section 1.1371-1(g) of the regulations as it existed prior to the issuance of the above treasury decision was as follows: If an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock.↩
3. It cannot be considered, and the contention is not made, that in effect Irving and Louis advanced money on behalf of the corporation and that the corporation redeemed Harry's stock. See Television Industries, Inc.32 T.C. 1297, affd. (C.A. 2) 284 F. 2d 322↩.