JAMES L. STINNETT, JR., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3414–67—3416–67, 3418–67, 3515–67, 5094–67.
Filed February 11, 1970.

---

[1] The following proceedings are herewith consolidated: James L. Stinnett, Jr., and Bonnie H. Stinnett, docket No. 3415–67; James E. Thomas and Cathern Thomas, docket No. 3416–67; Robert E. Brown and Grace H. Brown, docket No. 3418–67; Louis H. Heath and Mary S. Heath, docket No. 3515–67; Harold L. Roberts and Lois Roberts, docket No. 5094–67. Bonnie H. Stinnett, Cathern Thomas, Grace H. Brown, Mary S. Heath, and Lois Roberts are parties herein only because they filed joint returns with their husbands.

*Charles E. McClung*, for the petitioners.
*Brice Tondre*, for the respondent.

226

OPINION

*Issue 1.   Qualification under Section 1371 (a)*

The corporation sustained losses during the years in question which were reflected in the individual income tax returns filed by the various petitioners on the assumption that the corporation was a "small business corporation" as defined in section 1371(a) and had made a valid election to be taxed in accordance with the provisions of subchapter S. The respondent has disallowed those deductions on the ground that the corporation was not a small business corporation as defined in section 1371(a). That section provides:

(a) SMALL BUSINESS CORPORATION.—For purposes of this subchapter, the term "small business corporation" means a domestic corporation which is not a member of an affiliated group (as defined in section 1504) and which does not—
    (1)  have more than 10 shareholders;
    (2)  have as a shareholder a person (other than an estate) who is not an individual;
    (3)  have a nonresident alien as a shareholder; and
    (4)  have more than one class of stock.

In the stipulation of facts, the respondent concedes that the corporation meets the first three requirements for qualification under section 1371(a) but contends that the corporation had outstanding more than one class of stock. In support of this position, the respondent argues that certain advances to the corporation by the petitioners evidenced by installment notes gave rise to an "equity" interest which was, in substance and reality, redeemable preferred stock. As a result, the corporation had outstanding two classes of stock.

We have here a case in which four individuals joined together in a partnership to establish and operate a recreation facility on leased land. Each contributed an agreed amount to the capital of the partnership in order to finance the leasehold improvements. Each was to receive a share of the profits from the venture in percentages which varied, and appear not to have been dependent upon their respective capital contributions.

Within a relatively short period thereafter, the assets and liabilities of the partnership were transferred to a newly formed corporation which issued its common stock to the former partners in proportion to their share in the profits of the partnership. In addition, the corporation issued to each a non-interest-bearing note payable in installments for the amount of the capital contributed by each to the partnership. The installment payments on these notes were designed to liquidate the obligations over the term of the lease, thereby intending that the cash flow resulting from the amortization of the leasehold

improvements and from profits would provide sufficient funds to pay off the notes.

The corporation had only a nominal capitalization wholly inadequate for the needs of the business. The notes were non-interest-bearing and were subordinated in fact, if not by their terms, to the other indebtedness of the corporation. Because of the circumstances, the respondent contends that for tax purposes the so-called "debt" represented by these notes should be regarded as "equity" capital. From this premise, the respondent concludes that the corporation had outstanding two classes of stock. While the respondent's premise may be well taken, were we concerned with treatment of payments of principal or interest on account of these notes under general tax law, it is not determinative of the issue in this case. Even accepting the respondent's argument, we would not have two classes of stock, one class being represented by the common stock, and the other being represented by the notes.

The notes did not entitle the holders to any right to vote or to participate in the decision-making process. The notes did not entitle the holders to participate in any of the earnings or growth of the business, being limited solely to the repayment of the "debt" itself without interest. While the notes were subordinated and subject to all of the risks of the business, nevertheless it would be wholly unrealistic to treat these notes *standing* alone as another class of stock. The notes represented an "equity" interest only so long as coupled with the ownership of the common stock.

The obvious purpose of the notes was to provide that distributions by the corporation out of its "cash flow" would be applied first in repayment of the original capital shares of the former partners. Those amounts were disproportionate to their respective interests in the profits as represented by the common stock. Thus if we are to regard the notes as "equity," we either have an equity interest or capital advance which does not affect the character of the stock under section 1371, or we have three separate classes of stock.[4]

---

[4] At the outset the interests of Robert E. Brown and James L. Stinnett represented by stock and that represented by the notes were proportionate each to the other, but disproportionate to the interests of Louis H. Heath and Harold L. Roberts, and the respective interests of the latter were also disproportionate each to the other, as shown by the following comparison:

| | Proportionate right to vote and share in earnings | Proportionate right to distributions on account of notes |
|---|---|---|
| Class one: | | |
| Robert E. Brown | 27/100 | 8,504.35 |
| | | 88,014.49 |
| James L. Stinnett | 27/100 | 8,504.35 |
| | | 88,014.49 |
| Class two: | | |
| Louis H. Heath | 23/100 | 18,753.62 |
| | | 88,014.49 |
| Class three: | | |
| Harold L. Roberts | 23/100 | 52,252.17 |
| | | 88,014.49 |

Faced with this choice, it is our opinion that regardless whether the notes in question be considered as "debt" or as "equity" under other provisions of the internal revenue laws, for purposes of section 1371 such notes do not change the character of the common stock so as to give rise to more than one class of stock.

An instrument which upon its face constitutes evidence of indebtedness and does not carry with it rights or privileges commonly attributed to stock is generally deemed to be an "equity" interest by coupling the debt with a formal stock interest held by the same or a related person. That is the essence of the so-called thin-capitalization doctrine. *Ambassador Apartments, Inc.*, 50 T.C. 236, affirmed per curiam 406 F. 2d 288 (C.A. 2, 1969); *Fin Hay Realty Co.* v. *United States*, 398 F. 2d 694 (C.A. 3, 1968); *J. S. Biritz Construction Co.* v. *Commissioner*, 387 F. 2d 451 (C.A. 8, 1967); *Tomlinson* v. *1661 Corp.*, 377 F. 2d 291 (C.A. 5, 1967); *Smith* v. *Commissioner*, 370 F. 2d 178 (C.A. 6, 1966); see also 42 Tul. L. Rev. 251. In recognition of this, this Court concluded in *W. C. Gamman*, 46 T.C. 1 (1966), that where the debt was in the same proportion as the stock, there was not a second class of stock.

Following our decision in the *Gamman* case, the Commissioner amended regulations section 1.1371–1(g) to provide, in part, as follows:

Obligations which purport to represent debt but which actually represent equity capital will *generally* constitute a second class of stock. However, if such purported debt obligations are owned solely by the owners of the nominal stock of the corporation in substantially the same proportion as they own such nominal stock, such purported debt obligations will be treated as contributions to capital rather than a second class of stock. But, if an issuance, redemption, sale, or other transfer of nominal stock, or of purported debt obligations which actually represent equity capital, results in a change in a shareholder's proportionate share of nominal stock or his proportionate share of such purported debt, a new determination shall be made as to whether the corporation has more than one class of stock as of the time of such change. [Emphasis supplied.]

We do not regard as controlling with respect to the question whether there is more than one class of stock within the meaning of section 1371(a) the fact that "debt" characterized as "equity" capital may be disproportionate to the respective common stock interests of the stockholders. Accordingly, we must hold the regulation invalid as applied to this case. To hold otherwise not only would serve largely to defeat the purpose for which Congress enacted subchapter S, but would be inconsistent with the underlying scheme of the statute as exemplified by section 1376(b)(2).

Section 1376(b)(2) treats debt owing to shockholders as a secondary equity interest, in any event. That section provides:

(b) REDUCTION IN BASIS OF STOCK AND INDEBTEDNESS FOR SHAREHOLDER'S PORTION OF CORPORATION NET OPERATING LOSS.—

(1) REDUCTION IN BASIS OF STOCK.—The basis of shareholder's stock in an electing small business corporation shall be reduced (but not below zero) by an amount equal to the amount of his portion of the corporation's net operating loss for any taxable year attributable to such stock (as determined under section 1374(c)).

(2) REDUCTION IN BASIS OF INDEBTEDNESS.—The basis of any indebtedness of an electing small business corporation to a shareholder of such corporation shall be reduced (but not below zero) by an amount equal to the amount of the shareholder's portion of the corporation's net operating loss for any taxable year (as determined under section 1374(c)), but only to the extent that such amount exceeds the adjusted basis of the stock of such corporation held by the shareholder.

Not only is this a clear indication that the statute contemplates that the stockholders of a subchapter S corporation would make advances or lend money to the corporation, but for the purpose of reflecting losses deducted by the stockholders in their returns, any resulting debt is treated as a part of the stockholder's "investment." The losses which are charged to that investment can only be attributable to the interest of the stockholder represented by the common stock.

If we look to the effect of section 1376(b)(2), it thus becomes apparent that for purposes of subchapter S, the statute treats debt owing to a stockholder, whether or not regarded as equity for other purposes, as a part of that stockholder's equity interest in the corporation. Debt owing to a nonstockholder is treated differently.

It is not contemplated that all rights and interests of the stockholders of a subchapter S corporation will be equal. Even if the stockholder advances were initially in proportion to their respective stock interests, disproportionate rights could result on account of the limitation on the deductibility of losses which is dependent on the stockholder's basis for both the stock and debt.

In a case where the subchapter S corporation operates at a loss, the only effect of the mixed investment of stock and debt as between stockholders is to produce a different limitation—disproportionate to their respective stock interests—in the amount of loss each can deduct. A similar disproportion results if each acquires his stock at different times or at a different cost.

Where there are profits, application of the income in payment of the debt in lieu of the distribution of a dividend has the effect of increasing the basis—also the limitation of deduction of any future losses—of the stockholders who must report the income, and of reducing the overall investment of the stockholder who receives payment on the debt. No foreseeable tax benefit results to either. Such a capital structure merely provides a means whereby a participant who does not have the capital resources is able to reinvest the aftertax earnings of the business and thereby repay funds advanced by other participants. Such obviously was the intent in the case before the Court.

Since this type of transaction was clearly contemplated by the terms of the statute itself, and is the normal result of the operation of section 1376, it is only reasonable to assume that the Congress did not intend that debt owing to a stockholder of a subchapter S corporation would result in more than one class of stock under the thin-capitalization doctrine. That is not to say that an instrument called a "note" may not by its very terms be something else. However, where the instrument is a simple installment note, without any incidents commonly attributed to stock, it does not give rise to more than one class of stock within the meaning of section 1371 merely because the debt creates disproportionate rights among the stockholders to the assets of the corporation.

We do not have to decide whether the notes involved in this case might nevertheless be treated as "equity" for other purposes. We are not here concerned with the treatment of interest paid on those notes. In fact, no interest was paid. Nor are we concerned with characterizing the transaction to determine whether petitioners might have a bad debt loss in the event of worthlessness. We are not even concerned with the question whether such debt may not be treated differently under other provisions of the tax laws, even in the case of a corporation which has elected to be taxed under subchapter S. For example, there might be situations in which earnings accumulated prior to qualification under subchapter S are sought to be distributed to a stockholder-creditor of the corporation in the "guise" or repayment of debt.

All we are called upon to decide is whether the corporation (International Meadows) had outstanding more than "one class" of stock within the meaning of section 1371 of the Code. In the corporate or formal sense, clearly the corporation did not. There can be no question that under the laws of the State of California the corporation had outstanding 100 shares of common stock and nothing more. The only real question is whether in the "tax sense"—in order to carry out the legislative intent—we are required to disregard the form of the incorporation in order to reach a different conclusion.

The statute does not prescribe any rules which we may look to for guidance. The underlying rationale of the thin-capitalization doctrine seems to be, however, going back to *Gregory* v. *Helvering*, 293 U.S. 465, that the court will disregard the form of the transaction where it is to some degree lacking in substance *and* a failure to do so would serve to frustrate the purpose of the taxing statute. As we have pointed out, this is not that type of case. In fact, the only result of a contrary holding on this case would be to defeat an election which the Congress clearly intended to be of benefit to the small and frequently "thinly capitalized" business.

## Issue 2. Amortization of Leasehold Improvements

The question is whether the petitioners' lease with Standard Oil should be regarded as a lease for a specified term or whether it should be regarded as a lease for an indefinite term. This has been held to constitute a mixed question of law and fact, which requires us to look to not only the terms of the lease but the nature of the improvements and the relationship of the parties. *G. W. Van Keppel Co.* v. *Commissioner*, 295 F. 2d 767 (C.A. 8, 1961); *Highland Hills Swimming Club, Inc.* v. *Wiseman*, 272 F. 2d 176 (C.A. 10, 1959).

The evidence shows that the lessor was unwilling to commit itself to a lease of the property for a term certain. At most the lessor was willing to compensate the lessee for the unamortized cost of the property if the lessee's occupancy was terminated prior to 3 years, later extended to 6 years. In the event that the lessor exercised its right to take back the property prior to the expiration of the specified period, the lessor agreed to pay the lessee the unamortized costs of the improvements.

On the other hand, the lessee made substantial improvements to the property notwithstanding the petitioners' inability to obtain a lease for an longer term. While the lessee may have been protected in the event the tenancy terminated, prior to the expiration of the 3-year period, later modified to 6 years, it is doubtful if the petitioners would have been willing to incur substantial expenditures and to undertake the risk of loss if they did not expect to be able to use the property for a longer period. The petitioners' entire case must rest upon the premise that they went into the transaction in order to make a profit. It would not have been undertaken if all that they anticipated was repayment of their unamortized costs. At trial the petitioners testified that they expected to recoup their investments in the venture over the 6-year term of the modified lease, but despite this fact the extent of the improvements made indicates to us that the petitioners intended and believed that they would remain in possession for longer than 6 years.

In our opinion, from a consideration not only of the terms of the lease itself but the testimony of the witnesses and other circumstances, the lease between petitioners and Standard Oil was intended as a lease for an indefinite term of years, with a prescribed minimum term *first* of 3 years and *subsequently* of 6 years. The improvements should be depreciated over their useful lives. *G. W. Van Keppel Co.* v. *Commissioner*, *supra*.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

TANNENWALD, J., concurring: The vice of respondent's regulations is that, in an attempt to minimize the effect of our decision in *W. C. Gamman*, 46 T.C. 1 (1966), respondent has abandoned the "actually stock" concept contained in his original regulations. In my opinion, it is this concept that was in the mind of the Congress when section 1371(c)(4) was enacted, although I concede that the legislative history of that particular section is devoid of any material which would be of any direct assistance. Clearly, Congress was not concerned merely with different rights and liabilities among persons who had shareholder status as distinct from such rights and liabilities which inhere in that status as such. As the majority opinion points out, if this were not the case, the provisions of subchapter S dealing with indebtedness to shareholders would be, at the very least, anomalous. Moreover, there are prior indications that Congress had in mind shareholder status as such and was concerned with the allocation of undistributed earnings among shareholders because of differing claims on earnings which stemmed from their shareholder status.[1] To me, the essential question, under subchapter S, is whether the instrument has sufficient characteristics under the applicable local law to be designated as "actually stock." See concurring opinion of Withey, J., in *W. C. Gamman*, 46 T.C. at 12–13.

I also think it significant that there is no authority under subchapter S for the respondent to promulgate legislative regulations. This is in sharp contrast to such a grant of such authority in section 1244 which was enacted along with subchapter S and was also designed to aid small business concerns. In this connection, it should be noted that section 415 of the recently enacted Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487 (Dec. 30, 1969), provides legislative authority to respondent to determine whether "an interest in a corporation is to be treated for purposes *of this title* as stock or indebtedness." (Emphasis added.) This extremely broad grant still leaves open the question whether it includes authority to prescribe what is a *second class* of stock for purposes of subchapter S. Unfortunately, the legislative history is utterly silent on this point.

WITHEY, HOYT, and FEATHERSTON, JJ., agree with this concurring opinion.

FEATHERSTON, J., concurring:

I agree with the conclusion of the majority but add these thoughts.

The regulation we held invalid in *W. C. Gamman*, 46 T.C. 1 (1966), provided that "If an instrument purporting to be a debt obligation is

---

[1] Similar provisions to accompany the 1954 Code, which were not adopted, were discussed in S. Rept. No. 1622, 83d Cong., 2d Sess. (1954), which stated (p. 453): "No class of stock may be preferred over another as to either dividends, distributions, or voting rights. If this requirement were not made, undistributed current earnings could not be taxed to the shareholders without great complications."

*actually stock*, it will constitute a second class of stock." (Emphasis added.) Following our decision in *Gamman*, this language was amended to provide that "Obligations which purport to represent debt but which *actually represent equity capital* will generally constitute a second class of stock." (Emphasis added.) It is immediately observable that this new language is even less consistent with the statute than the invalidated regulation it replaced, for section 1371(a)(4) refers to "stock" but not to "equity capital."

The effect of the present regulation is to subject a corporation's subchapter S status to all the uncertainties, inconsistencies, and confusion derived from the unceasing stream of cases involving the debt-equity dichotomy, which, after all, is merely a tool for reasoning. See, e.g., *J. S. Biritz Construction Co.* v. *Commissioner*, 387 F. 2d 451 (C.A. 8, 1967), reversing a Memorandum Opinion of this Court; *Murphy Logging Co.* v. *United States*, 378 F. 2d 222 (C.A. 9, 1967), reversing 239 F. Supp. 794 (D. Oreg. 1965); *Nassau Lens Co.* v. *Commissioner*, 308 F. 2d 39 (C.A. 2, 1962), reversing 35 T.C. 268 (1960); *Byerlite Corp.* v. *Williams*, 286 F. 2d 285 (C.A. 6, 1960), reversing 170 F. Supp. 48 (N.D. Ohio 1958); *Gilbert* v. *Commissioner*, 248 F. 2d 399 (C.A. 2, 1957), remanding a Memorandum Opinion of this Court, opinion on remand affirmed 262 F. 2d 512 (C.A. 2, 1959), certiorari denied 359 U.S. 1002 (1959); *Miller's Estate* v. *Commissioner*, 239 F. 2d 729 (C.A. 9, 1956), reversing 24 T.C. 923 (1955); *Kraft Foods Co.* v. *Commissioner*, 232 F. 2d 118 (C.A. 2, 1956), reversing 21 T.C. 513 (1954). Since small corporations customarily depend on stockholder loans and guarantees for financing, I do not think Congress intended to make the harsh consequences of a "retroactive" termination of the election under section 1372(e)(3) subject to such inexactitude.

One of the purposes of the requirement in section 1371(a)(4) was—

to avoid the complexities involved in passing the earnings of a corporation through to its stockholders where the stock of the corporation is held by a widely diversified group of stockholders with different rights. See S. Rept. No. 830, 88th Cong., 2d Sess., p. 146, 1964–1 C.B. (Part 2) 650.

*W. C. Gamman, supra* at 7–8. The other pass-through provisions of subchapter S (i.e., those dealing with capital gains and net operating losses) likewise are workable only if there is a simple corporate structure with one class of stock. However, even the regulation implicitly recognizes that the computation of these pass-throughs is not complicated by the existence of notes held in proportion to stockholdings. And such computations are no more complex where the notes are held disproportionately.[1]

---

[1] While the character in the hands of the shareholders of distributions in retirement of disproportionately, or even proportionately, held notes, and the effect of the distributions on the corporation's earnings and profits, may depend upon whether the notes constitute "debt" or "equity," such distributions do not affect computation of the pass-throughs.

For these additional reasons, I agree that the regulation under consideration is so clearly at odds with the language and purposes of the statute that it cannot be sustained. See generally *Kurzner* v. *United States*, 413 F. 2d 97 (C.A. 5, 1969); *O'Neill* v. *United States*, 410 F. 2d 888 (C.A. 6, 1969); *United States* v. *Empey*, 406 F. 2d 157 (C.A. 10, 1969); *Edward A. Moradian*, 53 T.C. 207, 210–211 (1969); *Vincent B. Rodgers*, 51 T.C. 927, 930 (1969).

DRENNEN, FAY, HOYT, and TANNENWALD, *JJ.*, agree with this concurring opinion.

_____

STERRETT, *J.*, dissenting: With respect to the first issue, the problem presented for our decision is whether certain obligations denoted as debt, in fact, represent an equity interest and, if so, whether said equity interest results in the issuing corporation having more than one class of stock. I would give an affirmative answer to both questions and hence nullify the corporation's election to be taxed as a subchapter S corporation. Sec. 1371 (a) (4).

It seems evident, in weighing the indicia of debt and equity of the obligations, that the latter predominate: (1) The notes were not interest bearing; (2) the debt-equity ratio was 1080:1 (without the inclusion of indebtedness owed to outsiders); (3) an outside investor would not have made advances under the same terms as those accepted by the petitioner; (4) repayment of principal was to be made out of earnings only;[1] and (5) as was said in *2554–58 Creston Corp.*, 40 T.C. 932, 935 (1963): "A stockholder [in contrast to a creditor] * * * intends to make an investment and take the risks of the venture."

Since I do not understand the majority seriously to contest the fact that for all other purposes of the Code the obligations at issue would be deemed equity, there is no need to belabor this conclusion.

What is worth emphasizing is the fact that the majority would apply a special rule to the subchapter S situation. This I would not do and, in so holding, am reminded of this Court's opinion in *Edwin C. Hollenbeck*, 50 T.C. 740, 747 (1968), wherein we said:

> The debt-equity inquiry is essentially the same in all areas. The precise determination to be made—is there more than one class of stock, are notes bona fide indebtedness, etc., varies from case to case, but the basic standards remain the same in all cases where the respondent seeks to reclassify debt or equity. * * * [Emphasis supplied.]

The above quotation is singularly appropriate here for it was made in the context of a determination under section 1244 of the Code.

_____

[1] Having heard all of the testimony and having examined the documentary evidence, it would be my finding that the notes in question were to be repaid from only earnings or profits on a monthly basis over the life of the lease. Compare the opinion of the majority, *supra* at 229. Since the business was that of operating a driving range and small golf course at a particular location, presumably the business would be terminated upon expiration of the lease.

Furthermore, we said in another case involving section 1244, *Wesley H. Morgan*, 46 T.C. 878, 889 (1966):

but section 1244 being designed to provide a *tax benefit to a rather limited group* of taxpayers as it is, we feel that *qualification* for those benefits *requires strict compliance* with the requirements of the *law* and the *regulations* promulgated pursuant to the specific instructions therefor included in section 1244(e). [Emphasis supplied.]

The common goals of section 1244 and subchapter S make the above cases particularly pertinent. Section 1244 and subchapter S were both enacted as part of Pub. L. 85–866 which was approved on September 2, 1958. Section 1244 is entitled "Losses on Small Business Stock" and subchapter S is entitled "Election of Certain Small Business Corporations as to Taxable Status." There is no doubt that the two were enacted for largely overlapping purposes, namely, to aid small business.

Since it is my view, in concert with the foregoing authorities, that the obligations in issue represent an equity interest, then the question must be faced as to whether said equity interest results in the corporation having more than one class of stock.

Income Tax Regs. section 1.1371–1(g) provides in part as follows:

(g) *Classes of stock.* A corporation having more than one class of stock does not qualify as a small business corporation. * * * *Obligations which purport to represent debt but which actually represent equity capital will generally constitute a second class of stock.* However, if such purported debt obligations are owned solely by the owners of the nominal stock of the corporation in substantially the same proportion as they own such nominal stock, such purported debt obligations will be treated as contributions to capital rather than a second class of stock. * * * [Emphasis supplied.]

The above regulation is consistent with our comment in *W. C. Gammon*, 46 T.C. 1, 9 (1966):

we must also look to the realities of the situation to determine whether the instruments, even though they might represent equity capital, actually gave the holders thereof any rights and interests in the corporation different from that owned by the holders of the nominal stock. We do not think they did under the circumstances here present, because the advances were made and the *notes were held by the stockholders in direct proportion to their stockholdings.* * * * [Emphasis supplied.]

It will be recalled that the so-called debt obligations were held by the shareholders in disproportionate amounts to their stockholdings, a fact of which petitioners make much in support of their debt argument. However, once it is decided that the obligations in fact represent an equity interest, petitioners are hoisted on their own petard. It seems indisputable that, upon liquidation, distribution of the assets would first have to be made with respect to the so-called debt obligations with any excess thereof being distributed according to the

nominal stockholdings. Further, since the face amount of the alleged indebtedness is only payable out of earnings or profits, the holders of the alleged indebtedness are also entitled to a priority in the profits. This being so, the alleged debt instruments must represent at least a second class of stock. The general rule set forth in the regulations quoted above seems clearly applicable.

In reaching an opposite conclusion the majority necessarily invalidates the regulation quoted above. It seems to me that in so doing the majority is ignoring the following oft-quoted language of the Supreme Court in *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 501 (1948):

This Court has many times declared that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons. * * *

See also *Bingler* v. *Johnson*, 394 U.S. 741, 749–750; *Fawcus Machine Co.* v. *United States*, 282 U.S. 375, 378; *Boske* v. *Comingore*, 177 U.S. 459, 470; *Brewster* v. *Gage*, 280 U.S. 327, 336; *Textile Mills Corp.* v. *Commissioner*, 314 U.S. 326, 336–339; *Colgate Co.* v. *United States*, 320 U.S. 422, 426; *William F. Sanford*, 50 T.C. 823, 832, aff'd. 412 F.2d 201 (C.A. 2), certiorari denied 396 U.S. 841. I fail to see how the regulations can be deemed "unreasonable and plainly inconsistent" with the applicable statute.

The majority's case rests primarily on the view that Congress had the more traditional concepts of stock in mind when it prohibited a subchapter S corporation from having more than one class of stock. The difficulty with this view is that it is impossible to give it any direct support from the subchapter's legislative history. Hence, it rests on speculation which may be reasonable or unreasonable. However, even reasonable speculation, by any other name, remains speculation. I do not feel that we are justified in invalidating the Commissioner's regulation based upon speculation, particularly in light of the Supreme Court's opinions relating to the sanctity of regulations.

The majority cites section 1376 (b) [2] as proof of the fact that subchapter S contemplates that a shareholder may also make loans to his corporation. The short answer to that is, of course. But, that fact is of no assistance to us here in determining whether the particular obligation at issue represents a debt or equity interest.

The significance of section 1376 (b) is limited to the fact that the pass-through provisions of subchapter S obviously necessitated a further provision which would provide the manner in which the amounts

---

[2] With respect to the majority's comment that no foreseeable tax benefit results from the application of section 1376, see R. Anthoine, "Federal Tax Legislation of 1958: The Corporate Election and Collapsible Amendment," 58 Colum. L. Rev. 1146, 1161–1162.

passed through should be treated on each shareholder's individual income tax return. This significance or fact is, however, irrelevant to the problem at hand.

For all of the foregoing reasons I respectfully dissent from the majority opinion.

TIETJENS, RAUM, ATKINS, FORRESTER, and SIMPSON, *JJ.*, agree with this dissent.