**AMORY COTTON OIL COMPANY,**
Plaintiff-Appellee-Cross-Appellant,

v.

**UNITED STATES of America,**
Defendant-Appellant-Cross-
Appellee.

No. 71–1836.

United States Court of Appeals,
Fifth Circuit.

Oct. 24, 1972.

H. M. Ray, U. S. Atty., Oxford, Miss., Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, William L. Goldman, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

J. Kearney Dossett, Charles L. Brocato, Jackson, Miss., for plaintiff-appellee.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge.

This is a subchapter S[1] case concerning the requirement that a corporation electing subchapter S status have only one class of stock.[2] It presents the questions of whether purported debt of such a corporation may be recharacterized as equity capital constituting a second class of stock, causing the corporation to forfeit its subchapter S status and to become subject to ordinary corporate tax liability,[3] and, if there can be such recharacterization, what standards apply to determine if recharacterization is appropriate. These inquiries bring us to the meaning and the validity of Treasury Regulations § 1.371–1(g), as amended, T.D. 6904, 1967–1 Cum.Bull. 219, interpreting the one class of stock requirement.[4]

Amory elected in 1958 to be taxed as a subchapter S corporation. The Commissioner asserted deficiencies in Amory's income tax for fiscal 1962 and 1963 on the ground that advances made from time to time to the corporation by some of its stockholders and evidenced by promissory notes constituted a second class of stock, resulting in the corporation's loss of subchapter S status and for the years in question consequent liability for ordinary corporate income tax. The advances had been made over a period commencing in 1927, the year of the corporation's organization, and extending to the early 1960's. Amory paid the asserted deficiencies and sued for refund of $108,834.52. The District Court, after a trial without jury, found in favor of taxpayer and ordered the refund in full.[5]

## 1. The decision below and the contentions on appeal.

The trial court in an opinion reported at 320 F.Supp. 951, using indicia well-recognized for their utility in an analysis of whether corporate debt should be recharacterized as equity,[6] held that the advances made by shareholders were contributions to capital, not loans, and should be recharacterized as equity, but that they did not constitute a second class of stock. Amory was, therefore, not disqualified from subchapter S sta-

---

1. 26 U.S.C. §§ 1371–78.

2. 26 U.S.C. § 1371(a)(4).

3. For the corporation to continue to qualify, it must not at any time fail to meet the initial qualification requirements. 26 U.S.C. § 1372(e)(3).

4. The regulation provides

    (g) *Classes of stock:* A corporation having more than one class of stock does not qualify as a small business corporation. In determining whether a corporation has more than one class of stock, only stock which is issued and outstanding is considered. Therefore, treasury stock and unissued stock of a different class than that held by the shareholders will not disqualify a corporation under section 1371(a)(4). If the outstanding shares of stock of the corporation are not identical with respect to the rights and interest which they convey in the control, profits, and assets of the corporation, then the corporation is considered to have more than one class of stock. Thus, a difference as to voting rights, dividend rights, or liquidation preferences of outstanding stock will disqualify a corporation. However, if two or more groups of shares are identical in every respect except that each group has the right to elect members of the board of directors in a number proportionate to the number of shares in each group, they are considered one class of stock. Obligations which purport to represent debt, but which actually represent equity capital will generally constitute a second class of stock. However, if such purported debt obligations are owned solely by the owners of the nominal stock of the corporation in substantially the same proportion as they own such nominal stock, such purported debt obligations will be treated as contributions to capital rather than a second class of stock. But, if an issuance, redemption, sale, or other transfer of nominal stock, or of purported debt obligations which actually represent equity capital, results in a change in a shareholder's proportionate share of nominal stock or his proportionate share of such purported debt, a new determination shall be made as to whether the corporation has more than one class of stock as of the time of such change.

5. Plus an investment credit for 1963 of $53,591.24.

6. *E. g.,* Tyler v. Tomlinson, 414 F.2d 844 (5th Cir. 1969).

tus. The court specifically adopted as sound the reasoning of the Tax Court in *Gamman* [7] and *Stinnett* [8] and the District Court in *Portage*.[9]

*Gamman* had considered an earlier version of the regulation, the last sentence of which provided that "if an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock." *Gamman* had held:

> While we agree that the statutory language and the above objectives permit inquiry into whether an electing corporation has, in fact, more than one class of stock, we find nothing in the law itself, the committee reports, or the assumed purpose of the legislation that would justify holding, arbitrarily and per se, that all instruments which purport to be debt obligations but which in fact represent equity capital, must be treated as a second class of stock for purposes of section 1371. Consequently, we think the last sentence of the regulation, if given the connotation argued by respondent in this case, is too broad and places a restriction on the stockholders of electing corporations which was not intended by Congress. Congress obviously anticipated that stockholders of electing corporations could advance funds to corporations in the form of loans without disqualifying the corporation for subchapter S status, because it specifically made provision in section 1376 for adjustment of a shareholder's basis in any indebtedness owing him by the electing corporation for operation losses of the corporation

made available to the shareholder as a deduction. But under the regulation, applied as it is by respondent in this case, if the note or evidence of indebtedness is "actually stock," the corporation is automatically disqualified under subchapter S regardless of the terms of the note or the practical effect thereof. We think this is tantamount to an extension or modification of the law and goes beyond the Commissioner's powers. Where a regulation is an amendment or modification of the statute and therefore beyond the power of the Commissioner to make, courts must refrain from giving it effect. Louisville Gas and Electric Co. v. United States, 148 Ct.Cl. 671 (1960). We think such is the situation here.

46 T.C. at 8. The Tax Court then held, independently of the regulation, that the notes were neither debt obligations nor a second class of stock but simply evidenced contributions of additional capital reflected in the value of the common stock (held by the petitioners in the same proportions in which advances were made).

*Stinnett* was concerned with the current amended regulation. The Tax Court viewed the particular notes as representing advances of stockholders in a type of transaction contemplated by the terms of the statute and expected as the normal result of operation of § 1376(b), which "treats debt owing to a stockholder, whether or not regarded as equity for other purposes, as a part of that stockholder's equity interest in the corporation." 54 T.C. at 231.[10]

7. Gamman v. Comm'r, 46 T.C. 1 (1966).

8. Stinnett v. Comm'r, 54 T.C. 221 (1970), appeal docketed, 9th Cir.

9. Portage Plastics Co. v. U. S., 301 F. Supp. 684 (W.D.Wis.1969), rev'd, 470 F.2d 308 (7th Cir. 1972).

10. The court explained that as a result of § 1376:
"Even if the stockholder advances were initially in proportion to their respective stock interests, disproportionate rights could result on account of the limita-

tion on the deductibility of losses which is dependent on the stockholder's basis for both the stock and debt.
In a case where the subchapter S corporation operates at a loss, the only effect of the mixed investment of stock and debt as between stockholders is to produce a different limitation—disproportionate to their respective stock interests—in the amount of loss each can deduct. A similar disproportion results if each acquires his stock at different times or at a different cost.

It held that "it is only reasonable to assume that the Congress did not intend that debt owing to a stockholder of a subchapter S corporation would result in more than one class of stock under the thin capitalization doctrine." 54 T.C. at 232. At the same time it recognized that a note evidencing such a debt might "by its very terms" confer sufficient of the usual incidents of stock that in fact it could be stock. *Id.* The court rejected the regulation as invalidly applied, the Commissioner having proceeded on the basis that treatment of the notes must be treated as a second class of stock unless held in proportion to stock ownership.

In *Portage* the notes representing advances were held partly by the owners of the nominal stock and partly by outsiders. The District Court, employing usual debt-equity standards, concluded that the notes represented contributions to capital. But, just as did the District Court in the present case, it refused to take a second step of holding that the notes constituted a second class of stock within the meaning of § 1371(a)(4). It declined to adhere to the amended regulation, concluding that to hold the particular instruments a second class of stock within the meaning of § 1371(a)(4) would not serve the purposes of subchapter S in general or of the one class of stock requirement in particular.

In the instant case the District Court adopted "the more reasonable rule" as

> Where there are profits, application of the income in payment of the debt in lieu of the distribution of a dividend has the effect of increasing the basis—also the limitation of deduction of any future losses— of the stockholders who must report the income, and of reducing the overall investment of the stockholder who receives payment on the debt. No foreseeable tax benefit results to either. Such a capital structure merely provides a means whereby a participant who does not have the capital resources is able to reinvest the aftertax earnings of the business and thereby repay funds advanced by other participants. Such obviously was the intent in the case before the Court."
> 54 T.C. at 231.

stated by the foregoing cases,[11] and found that the notes, though recharacterized as equity, did not constitute a second class of stock. While the court stated that its decision would turn on the validity of the provision in the regulation that "obligations which purport to represent debt but which actually represent equity capital will generally constitute a second class of stock," its ultimate consideration of validity was in terms of application to the facts and not of facial validity.

In this appeal the Commissioner contends that the court properly recharacterized the notes as equity. But he urges that the court then committed error in failing to hold that the notes constituted a second class stock, and that such a holding was required by the regulation since the notes were held disproportionately to Amory's stock.[12]

The taxpayer responds (by cross-appeal) with the contention that the debt-equity dichotomy has no application in the subchapter S field; that is, that if for corporate purposes it has only one class of stock then it can have only one class for tax purposes, so that the District Court should not have inqured into whether what was labeled as debt really was equity. Alternatively, Amory contends that if debt-equity criteria are to be applied, the court was plainly erroneous in finding the loans to be contributions to capital. And, finally, it urges that the amended regulation is invalid.

11. Courts in other cases as well have held the amended regulation either invalid as applied or on its face, employing generally the same reasoning as in *Gamman*, *Stinnett*, and *Portage*. See Shores Realty Co. v. U. S., 27 A.F.T.R.2d 679 (S.D. Fla.1971), aff'd this date, 468 F.2d 572 (5th Cir., Oct. 24, 1972); Brennan v. O'Donnell, 322 F.Supp. 1069 (W.D.Ala. 1971); H. R. Spinner Co., 29 T.C.M. 462 (1970), appeal docketed, 9th Cir.; August R. Nielson Co., 27 T.C.M. 44 (1968).

12. Disproportionality has been rejected as a relevant factor in a number of cases. See part 5, *infra*. The Commissioner contends that those cases are incorrectly decided.

Numerous difficulties coalesce in the legal issue at hand. The subchapter S statutes contain opposing tensions that cannot be harmonized. The penalty for failure, even unintentional or unwitting, to remain in compliance with the initial requirements for subchapter S status is severe—not merely loss · of immediate tax benefits but termination of status, with far-reaching corporate and tax consequences for the corporation, stockholders and debt holders. Importation of debt-equity concepts into the field brings a massive body of law, itself not easy to handle, into a corporate tax structure one of whose touchstones was to be simplicity. In attempts to solve the prickly problem litigants and courts have stumbled over semantics and conceptualism.

### 2. Is debt-equity relevant?

█ Turning first to the cross-appeal, we reject the concept that the debt-equity distinction has no relevance to the subchapter S corporation and that as a matter of law recharacterization of debt to equity may not be employed for the subchapter S corporation. Our primary guide must be the statute. The single stock requirement is in the statute. That requirement would be effectively repealed by judicial action if form were so allowed to control substance that what purports to be debt but according to objective criteria is equity cannot be treated as what it is. The Commissioner and the courts are not required to accept as conclusive the label of debt given by the corporation and those with whom it deals (often its own stockholders) to their own transactions.

In addition, 26 U.S.C. § 385(a) provides:

The Secretary . . . is authorized to prescribe such regulations as may be necessary or appropriate to deter-mine whether an interest in a corporation is to be treated for the purposes of this title as stock or indebtedness.

By its terms this provision is applicable to all of Title 26, and there is no language in subchapter S purporting to exempt it therefrom.

Recharacterization of debt arose as a counter to conventional (subchapter C) corporations' utilizing stockholder-supplied funds and avoiding double taxation by paying the contributors returns treated by the parties as interest rather than dividends. In general, subchapter S is designed for a qualifying corporation to avoid the double taxation of corporate earnings by eliminating corporate income tax. While no tax avoidance scheme is alleged in the present case, there are a number of ways in which a subchapter S corporation can use debt obligations for the purpose of tax avoidance. Note, Shareholder Lending and Tax Avoidance in the Subchapter S Corporation, 67 Colum.L.Rev. 495, 501–05 (1967). A bar on inquiry into whether debt is what it purports to be may impinge on elimination of schemes that serve no legitimate purpose.

We recognize the lure of avoiding the imposition upon subchapter S corporations of the "uncertainties, inconsistencies, and confusion derived from the unceasing stream of cases involving the debt-equity dichotomy,"[13] by simply defining the problem out of existence. But that luxury is not available to us.

*Gamman* recognized the propriety of inquiry into whether purported debt of the subchapter S corporation is equity: "We agree that the statutory language and the above objectives permit inquiry into whether an electing corporation has, in fact, more than one class of stock." 46 T.C. at 8. *Stinnett* did also: "This is not to say that an instrument called a 'note' may not by its very terms be something else." 54 T.C. at 232. The District Court made just such an inquiry in *Portage*. The more recent decision in Brennan v. O'Donnell, 322 F. Supp. 1069, 1072 (N.D.Ala.1971) recog-

---

13. Featherston, J., concurring in *Stinnett, supra* at 235.

nizes the propriety of debt-equity inquiry.

The Seventh Circuit, in a 2–1 decision, has only recently reversed *Portage.* 470 F.2d 308 (7th Cir. 1972). However, all three judges agreed that an inquiry into whether purported loans in reality constitute capital is appropriate, the majority considering it available generally while the dissenting judge considered it appropriate only in the instances in which it might reveal abuse or improper tax avoidance by use of debt as a guise.

*3. What are the standards for finding a second class of stock?*

■ Accepting the necessity and the propriety of inquiry into whether an electing corporation has violated the single class of stock requirement by having what purport to be debt obligations, there must be standards that govern the inquiry. The traditional debt-equity criteria are merely working tools aiding in analysis. They are "at most, helpful factors to be considered, and not fiats to be bound by. We disapprove of rubricating such 'tests' into talismans of magical power." Georgia Southern & F. Ry. v. Atlantic Coast Line R. Co., 373 F.2d 493, 498 (5th Cir.), cert. denied, 389 U.S. 851, 88 S.Ct. 69, 19 L.Ed.2d 120 (1967). These tools of analysis may be employed for the subchapter S corporation only with the recognition that for purposes of § 1371(a)(4) the inquiry differs from the usual case because it must take into account that tax-wise the corporation is different from a subchapter C corporation. Whether the analysis is in two steps (debt is equity and equity is a second class of stock) or one combined step (debt is a second class of stock), the distinctions between subchapters C and S require that the underpinnings of subchapter S be fed into the decisional process along with traditional factors that aid the courts in a debt-eq-

uity question. This will necessitate considerable case-by-case inquiry. The consequence of adding to the decisional process factors peculiar to the subchapter S corporation and to its one class of stock requirement will be that debt which for other purposes or in the instance of a non-subchapter S corporation might be recharacterized as stock will not necessarily be a second class of stock for purposes of § 1371(a)(4). Our view also might be said to cause the existence of what might be termed "non-stock equity"[14] or "stock for other purposes but not for § 1371(a)(4) purposes."[15]

■ One of the factors which must be recognized in the decisional process is the general purpose of subchapter S to permit small businesses to select a form of organization without the necessity of taking into account major differences in tax consequences. S.Rep. 1983, 85th Cong. 2d Sess. (1958). *See also* Brennan v. O'Donnell, *supra* at 1073:

[A] stated purpose for passage of subchapter S was to encourage the selection of business forms for reasons other than tax consequences—a purpose which will certainly be frustrated by a policy which prevents owners from putting new capital directly into their businesses once they have selected the corporate form.

Another factor is that the statutory framework envisions stockholder loans to the subchapter S corporation:

Congress obviously anticipated that stockholders of electing corporations could advance funds to corporations in the form of loans without disqualifying the corporation for subchapter S status, because it specifically made provision in section 1376 for adjustment of a shareholder's basis in any indebtedness owing him by the electing corporation for operating losses of the corporation made available to the shareholder as a deduction. But un-

14. Bravenec, The One Class of Stock Requirement of Subchapter S—a Round Peg in a Pentagonal Hole, 6 Hous.L.Rev. 215, 231 (1968).

15. *See* Rosenkranz, Subchapter S: The Presidential Proposals, 55 ABAJ 1181 (1969).

der the regulation, applied as it is by respondent in this case, if the note or evidence of indebtedness is "actually stock," the corporation is automatically disqualified under subchapter S regardless of the terms of the note or the practical effect thereof. We think this is tantamount to an extension or modification of the law and goes beyond the Commissioner's powers. Where a regulation is an amendment or modification of the statute and therefore beyond the power of the Commissioner to make, courts must refrain from giving it effect. Louisville Gas and Electric Co. v. United States, 148 Ct.Cl. 671 (1960). We think such is the situation.

*Gamman, supra* at 8. *Stinnett* is to the same effect.

[Section 1376(b)(2) is] a clear indication that the statute contemplates that the stockholders of a subchapter S corporation would make advances or lend money to the corporation.

\*   \*   \*   \*   \*   \*

[I]t is only reasonable to assume that the Congress did not intend that debt owing to a stockholder of a subchapter S corporation would result in more than one class of stock under the thin-capitalization doctrine. That is not to say that an instrument called a "note" may not by its very terms be something else. However, where the instrument is a simple installment note, without any incidents commonly attributed to stock, it does not give rise to more than one class of stock within the meaning of section 1371 merely because the debt creates disproportionate rights among the stock-

holders to the assets of the corporation.

54 T.C. at 231–32. The IRS interpretation that investment in debt obligations must be pro rata to stock to avoid recharacterization tends to limit use of subchapter S to those businesses in which shareholders are able to make such pro rata investments.[16] A third factor that bears consideration is the particular use of debt—whether in a specific instance it serves a purpose within the contemplation of subchapter S.[17]

In the present case the sole purpose urged by the government for the one class of stock requirement in particular is that it was intended to prevent administrative compexities arising from allocation of undistributed taxable earnings *among several classes of stock* and pass-through of losses to several classes having different rights and interests. We reject an approach emphasizing that purpose to the exclusion of consideration of the competing factors injected by the purposes of subchapter S in general. Indeed, the emphases due the purported accounting complexities must be measured by recognition that allocation difficulties exist [18] only in narrowly circumscribed circumstances,[19] and pass-through complexities lack substance so long as the taxing authorities do not concern themselves with matters outside the scope of their legitimate concern, such as intracorporate financing methods that do not impair revenue.[20]

### 4. *Application in this case.*

■ The District Court applied essentially the approach which we think is

---

16. Bravenec, *supra*, note 14, at 233, 238.

17. *See* Bravenec, *supra* note 14, at 247–61; Note, 67 Colum.L.Rev. 495, 509–12, 517–22 (1967).

18. One commentator has found on close analysis that the income allocation problems "are largely nonexistent." Note 67 Colum.L.Rev. 495, 512–14 (1967). See also Judge Cummings, dissenting, in *Portage*, 470 F.2d 308, at 320 n. 12 (7th Cir. 1972).

19. Bravenec, *supra* note 14, at 245–46 (when "there would be a combination of profits taxed to the common shareholders without distributions to them and later nontaxable distributions to holders of debt recharacterized as equity, which distributions would otherwise be taxable if there were sufficient earnings and profits").

20. *See* Note, 67 Colum.L.Rev. 495, 514–17 (1967).

required. We are not able to say that it erred in concluding that the notes, though representing capital, were not a second class of stock within the meaning of § 1371(a)(4). Thus we affirm the District Court's inquiry and the result thereof.

The Seventh Circuit opinion in *Portage*, handed down July 18, 1972, does not persuade us either to a different approach or different result. The majority held that the District Court appropriately applied established debt-equity criteria and concluded correctly that the instruments in question evidenced contributions to capital. Next, it held that the instruments were "stock," because that is the name commonly used to designate an interest in corporate equity, especially where the contributors have been given no other instruments as evidence of interest in the equity. As a third step it applied the amended regulation, § 1371–1(g), as a valid mandate, requiring that once the initial determination had been made the "stock" was "stock within the meaning of § 1371(a)(4)":

> [I]t is our opinion that once the initial judicial determination has been made, the law as set forth by section 1331(a)(4) and Treasury Regulation § 1371–1(g) answers the second question. In other words we are of the opinion that there is no such thing as "non-stock equity," the creature of a conclusion that the evidences of a capital contribution are *not* stock.
>
> .  .  .

At 312. The undergirding premise of the majority is that holders of debt instruments can enjoy no rights and interests different from and preferential to those of holders of the nominal (authorized and issued) stock. The court considers that certain of the traditional debt-equity indicia will be helpful as guides in examining debt instruments versus stock to ascertain if the debt holders enjoy preferential differences. And, if inquiry reveals such preferential

rights or interests, the Commissioner may recharacterize the debt as equity, and the regulation then takes over to denominate it as a second class of stock.

The dissenting opinion considers reclassification of debt to equity to be applicable only where there is a tax avoidance scheme, and then only for the purpose of denying the particular benefit claimed and not for retroactive denial of subchapter S status to the corporation. Also it declines to accept the "semantic argument" of the Commissioner, adopted by the majority, which mandates the ultimate answer once debt has been redenominated as equity.

> Needless to say, the Commissioner's semantic argument that reclassified debt must be denominated stock, and since different from the common shares, a second class of stock is singularly unpersuasive. One would have thought that long ago the law, even tax law, was freed from the rigors of such formalism. The only inquiry must be a functionally oriented one, engaged in with the realization that because a debt may be considered the equivalent of stock for one purpose it is not thereby the equivalent of stock for all other purposes.

At 319.

The view of the majority in *Portage* rests upon what is considered to be an imperative necessity for identity of rights and interests between holders of stock and holders of debt interests, which in turn rests upon the policy of avoiding difficulties of allocation of earnings and losses. This view takes the identity of interest which the court in *Gamman* found to be a saving factor, and elevates it to the status of *sine qua non*. It does so in the face of the fact that proportionality of stock and debt holdings has repeatedly been rejected. *See* part 5, *infra*. We cannot accept this focus upon a single policy which gives no room for consideration of Congress' recognition that subchapter S corporations will often have limited capital and

must borrow, and its apparent intention that borrowing from stockholders may occur without causing loss of the special tax status. In addition, like the dissenting judge, we do not accept the conceptualistic view that every contribution to the capital of a subchapter S corporation which is not authorized and issued stock must be a second class of stock within the meaning of § 1371(a)(4).

### 5. *Validity of the regulation.*

■ Turning to the regulation, we conclude that both facially and in its application to this case it is arbitrary and beyond the power of the Commissioner. The rigid "identity of rights and interest" rule [21] and the "will generally constitute" rule [22] incorporate into the regulation an improper conceptualistic approach that ignores the true inquiry that we have discussed, which is debt-versus-equity read together with the underpinnings of subchapter S and the rationale of the one class of stock requirement. The criteria which we have discussed above as appropriate for ultimate decision of whether debt obligations constitute a second class of stock for purposes of § 1371 may not be replaced by the arbitrary formulas of the regulation. The exception of proportionality does not save the regulation but rather adds to its arbitrariness. As we have pointed out in our discussion of the opinion of the Seventh Circuit in *Portage*, we do not concur in the view that proportionality, which was a saving factor in *Gamman*, is to be elevated to the status of a *sine qua non* for all cases. Since *Gamman*, proportionality as a controlling factor has been rejected in *Stinnett*,

*Brennan, Spinner, Shores Realty* and *Nielson.*

The Commissioner's attempted application of the regulation in this case lends force to the conclusion of facial invalidity. "Will generally constitute" would on its face seem to be less than a mandate. But the construction advanced, in fact insisted upon, by the Commissioner is that the regulation is mandatory in operation unless the specific exception of proportionality is applicable. This treatment of the word "generally" as imposing a field of limitation to the extent of only the proportionality exception is to treat the word as surplusage. However, even if "will generally constitute" is intended to have a meaning broader than the government's construction of "will, subject to the proportionality exception, constitute," it is unclear whether that broader meaning is a mere prediction of statistical likelihood, or a sort of special presumption running against the taxpayer and unrelated to his usual burden of proving the Commissioner's determination wrong, or some other meaning. In any event, we can perceive no rational relationship which it bears to appropriate criteria.[23]

### 6. *Conclusion.*

Thus on both appeal and cross-appeal we affirm the judgment of the District Court, but modify the judgment by ordering and adjudging that Treasury Regulations § 1371-1(g), as amended, T.D. 6904, 1967-1 Cum.Bull. 219, is invalid both facially and as applied in this case.

Modified and affirmed.

[21] I. e., "If the outstanding shares of stock of the corporation are not identical with respect to the rights and interest which they convey in the control, profits, and assets of the corporation, then the corporation is considered to have more than one class of stock."

[22] I. e., "Obligations which purport to represent debt but which actually represent equity capital will generally constitute a second class of stock."

[23] There is at least a suspicion that, the arbitrary per se rule of the regulation prior to amendment having been held invalid in *Gamman*, the word "generally" may have been tossed in to give an appearance of a softened and less rigidly formalistic approach. Cf. Bravenec, *supra* note 14, at 232:

"The IRS, however [by the post-*Gamman* amendment of the regulation] seems to have adopted a rule of convenience rather than a change of heart."