Estate of William M. Allison, Deceased, the First National Bank of Chicago, and Henry F. Tenney, Coexecutors, Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 5709–69.    Filed November 1, 1971.

*Richard A. Beyer* and *Thomas H. Kaufman*, for the petitioners.
*Lewis M. Porter, Jr.*, for the respondent.

Tannenwald, *Judge:* Respondent determined deficiencies in the decedent's income tax for 1963, 1964, and 1966 as follows:

| Year ending | Deficiency determined |
|---|---|
| December 31, 1963 | $49,982.52 |
| December 31, 1964 | 32,145.00 |
| November 23, 1966 | 11,695.59 |

In view of petitioners' concessions, the only issue remaining for decision is whether advances by decedent to a certain corporation, in which the decedent was also a shareholder, created a second class of stock so as to make the corporation ineligible to be treated as a subchapter S corporation (sec. 1371 *et seq.*).[1]

---

[1] All references are to the Internal Revenue Code of 1954, as amended.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

The petitioners are the First National Bank of Chicago and Henry F. Tenney, coexecutors of the Estate of William M. Allison, deceased. The principal place of business of the First National Bank of Chicago, at the time the petition was filed, was located in Chicago, Ill. The legal residence of Henry F. Tenney, at the time the petition was filed, was Winnetka, Ill. William M. Allison filed individual Federal income tax returns on a cash basis for the taxable years 1963 and 1964 with the district director of internal revenue, Chicago, Ill. Allison died on November 23, 1966. An individual Federal income tax return was filed for William M. Allison, deceased, for the period ending November 23, 1966, with the district director of internal revenue, Chicago, Ill.

In 1961, Allison and John Stetson (hereinafter referred to as Stetson) decided to build a private membership swimming club on ocean-front property in Riviera Beach, Fla. An appropriate landsite was selected and purchased by Allison personally for a $50,000 initial payment and a deferred balance of $60,000, or a total purchase price of $110,000.

Allison and Stetson formed P.B.R.C., Inc. (hereinafter referred to as PBRC), on February 26, 1962. PBRC was capitalized for $30,000, represented by 3,000 shares of common capital stock with a stated par value of $10 per share. On March 1, 1962, Allison assigned to the corporation title to the clubsite and the remaining contractual obligations relative thereto. Two thousand shares were issued to Allison in exchange for $20,000 of the $50,000 downpayment he made on the purchase price of the land. Stetson, a professional architect, received 1,000 shares in return for his services in designing, subcontracting, and supervising construction of the facilities to be installed on the property. No additional shares of common stock were issued after March 1, 1962.

The cost of improvements to be placed on the property was initially estimated at approximately $200,000. It was anticipated that bank financing would be the sole source of funds for construction, and Community Federal Savings & Loan Association of Riviera Beach (hereinafter referred to as Community Federal) had informally indicated that it would make a $300,000 first-mortgage loan on the land and improvements. This sum was considered to be roughly sufficient to cover both land and improvement costs. It was contemplated that the costs of furniture, fixtures, and equipment were to be financed by loans secured by chattel mortgages. No facility similar to that to be constructed by PBRC then existed in the Palm Beach area, and a survey indicated that the club could expect a membership of 400 to 500 in its

first year of operation. It was believed that only 300 members would be required to break even.

Allison and Stetson hoped to finance their venture through loans from third parties, investing as little of their own resources as possible. They anticipated that the venture would generate enough income to pay off such loans within 15 years or less.

Construction of the club facilities began early in 1962. It soon became apparent that construction costs had been underestimated relative to the planned facilities, and, in addition, had to be increased to accommodate additional features, such -as tennis courts, which had not been included in the original plan but which Allison and Stetson had become convinced would be necessary to make the club more attractive. Accordingly, construction costs were revised upward to $270,000. At the same time, Community Federal indicated that it would be unwilling to lend more than $250,000 unless Allison personally guaranteed the loan (which he refused to do) and that it would require a first mortgage upon all equipment in addition to a first mortgage on the land and building. A construction loan in the amount of $250,000 was obtained from Community Federal on or about March 1, 1962. PBRC gave its promissory note, secured by first mortgages as indicated above, to Community Federal for $250,000 to bear interest at 6.6 percent and to be repaid in monthly installments of $2,192 commencing August 20, 1962. The note was personally guaranteed by Stetson.

An additional loan of $57,499.20 (all that the bank was willing to lend) was obtained from the Bank of Palm Beach & Trust Co. to finance the acquisition of equipment costing approximately $110,000. The Bank of Palm Beach loan was primarily secured by the personal guarantee of Stetson. A second mortgage on the club's equipment was also given.

PBRC kept its books on a fiscal year ending September 30. Beginning March 1, 1962, Allison transferred funds to PBRC in varying amounts and on various times as follows:

(a) In fiscal 1962, on three occasions, in the aggregate amount of $174,623.37, including $30,000 representing the balance of the $50,000 initial payment made by Allison for the land.

(b) In fiscal 1963, on 11 occasions, in the aggregate amount of $60,000.

(c) In fiscal 1964, on 12 occasions, in the aggregate amount of $65,764.19.

(d) In fiscal 1965, on six occasions, in the aggregate amount of $24,000, the last advance being made on April 30, 1965.

Stetson made the following transfers on open account to PBRC:

(a) In fiscal 1965 and beginning after April 30, 1965, on six occasions, in the aggregate amount of $51,800.

(b) In fiscal 1966, on two occasions, in the aggregate amount of $8,900.

Allison received from PBRC its negotiable promissory note bearing 3-percent interest payable semiannually (with interest on deferred interest payments) and payable on demand for each transfer of funds he made directly to the corporation as above indicated up to and including a transfer made on December 13, 1963. All transfers of funds made by Allison to PBRC after that date were made on open account. According to the minutes of PBRC, the initial transfer, represented by $30,000 of the downpayment on the land, was to be repaid "from earnings of the corporation as available." The only interest paid to Allison was $1,050 paid during PBRC's taxable year ended September 30, 1966. All obligations of PBRC with respect to funds transferred by Allison were subordinated to the Community Federal loan.

Allison's transfers of funds of $174,623.37 through September 30, 1962, when the club was fully completed and ready for its first winter season, were approximately equal to the difference between total costs of $490,000 ($110,000 in land costs, $270,000 in construction costs, and $110,000 in equipment costs) and total outside financing of approximately $300,000.

By the fall of 1962, a major hotel in the area had announced its intention to remodel and convert part of its property to a membership-type facility comparable to that offered by PBRC. At about this time, the City of North Palm Beach also publicized its decision to build a family-type membership club using public funds. The North Palm Beach area had been expected to supply much of PBRC's anticipated clientele. PBRC's membership never exceeded 150 in its first year and throughout the taxable years in question never reached 200. The sums advanced by Allison were used to make up the deficit in the club's operating costs.

PBRC never made money. According to PBRC's tax returns, it incurred operating losses and took depreciation as follows:

| FYE  Sept. 30— | Loss | Depreciation |
|---|---|---|
| 1963 | $98,743.77 | $30,902.25 |
| 1964 | 66,859.01 | 28,392.18 |
| 1965 | 63,264.91 | 26,085.98 |
| 1966 | 46,120.19 | 23,675.42 |

On April 12, 1966, Stetson purchased all of Allison's interest in PBRC for $50,000.

On October 24, 1962, PBRC elected to be treated as a small business corporation under subchapter S of the Internal Revenue Code of 1954, effective for its taxable year beginning October 1, 1962. This election

was consented to by Allison and Stetson, and PBRC filed U.S. Small Business Corporation Returns of Income for its taxable years ended September 30, 1963, September 30, 1964, September 30, 1965, and September 30, 1966, with the district director of internal revenue, Jacksonville, Fla.

OPINION

The basic question presented herein is whether PBRC qualified as a small business corporation under section 1371(a) during the years in question. If it did, the decedent-shareholder was entitled to receive a "pass-through" of PBRC's net operating losses under section 1374(a) and investment credit under section 48(e).

Of course, if we were to find that the obligations to PBRC with respect to Allison's advances constituted bona fide indebtedness, there would be no need for any further inquiry and petitioners would clearly prevail. On the other hand, even if we were to decide that such obligations did not constitute bona fide indebtedness, but rather that they represented "equity" in PBRC, our task would not be finished; we would still have to determine whether such obligations should be treated as a second class of stock, in which event the proscription of section 1371(a)(4) would apply. In view of the fact that we are satisfied that this latter issue should be resolved in petitioners' favor, we find it unnecessary to decide whether the obligations should be characterized as debt or equity.

At the outset, we note that respondent has been singularly unsuccessful in convincing the courts that purported indebtedness, which has been found to constitute "equity," should be classified as a second class of stock, thereby disqualifying the corporation from the benefits of subchapter S.[2] Respondent seeks to avoid the impact of these decisions by pointing to the disproportionality of the "advances" by Allison and Stetson. In so doing, he relies upon section 1.1371-1(g), Income Tax Regs., which provides in part as follows:

Obligations which purport to represent debt but which actually represent equity capital will generally constitute a second class of stock. However, if such purported debt obligations are owned solely by the owners of the nominal stock of the corporation in substantially the same proportion as they own such nominal stock, such purported debt obligations will be treated as contributions to capital rather than a second class of stock. But, if an issuance, redemption,

---

[2] *Shores Realty Co. v. United States,* F. Supp. (S.D. Fla. 1971) ; *Amory Cotton Oil Co. v. United States,* 320 F. Supp. 951 (N.D. Miss. 1970) ; *Portage Plastics Co. v. United States,* 301 F. Supp. 684 (W.D. Wis. 1969) ; *Brennan v. O'Donnell* (N.D. Ala. 1968, 21 A.F.T.R. 2d 1028, 68–1, U.S.T.C. par. 9314), remanded on other grounds 426 F. 2d 218 (C.A. 5, 1970), on remand 322 F. Supp. 1069 (N.D. Ala. 1971) ; *James L. Stinnett, Jr.,* 54 T.C. 221 (1970), on appeal (C.A. 9, Sept. 23, 1970) ; *Milton T. Raynor,* 50 T.C. 762 (1968) ; *W. C. Gamman,* 46 T.C. 1 (1966) ; *H. R. Spinner Corp.,* T.C. Memo. 1970–99; *Sam Novell,* T.C. Memo. 1969–255 ; *Lewis Building & Supplies, Inc.,* T.C. Memo. 1966–159. Contra, *Henderson v. United States,* 245 F. Supp. 782 (M.D. Ala. 1965) ; *Catalina Homes, Inc.,* T.C. Memo. 1964–225.

sale, or other transfer of nominal stock, or of purported debt obligations which actually represent equity capital, results in a change in a shareholder's proportionate share of nominal stock or his proportionate share of such purported debt, a new determination shall be made as to whether the corporation has more than one class of stock as of the time of such change.

Respondent put forward the same argument in *James L. Stinnett, Jr.*, 54 T.C. 221 (1970), on appeal (C.A. 9, Sept. 23, 1970), and we answered him thusly in an opinion reviewed by the full Court:

> We do not regard as controlling with respect to the question whether there is more than one class of stock within the meaning of section 1371(a) the fact that "debt" characterized as "equity" capital may be disproportionate to the respective common stock interests of the stockholders. Accordingly, we must hold the regulation invalid as applied to this case. To hold otherwise not only would serve largely to defeat the purpose for which Congress enacted subchapter S, but would be inconsistent with the underlying scheme of the statute as exemplified by section 1376(b)(2). [54 T.C. at 230.]

In *Stinnett*, we made it clear that the so-called thin-capitalization doctrine so often applied in cases involving the issue of debt versus equity was not determinative of the existence of a second class of stock for the purposes of subchapter S. See 54 T.C. at 232. At the same time, we recognized that, even for purposes of subchapter S, an instrument designated as debt may *"by its very terms* be something else." (Emphasis added.) *Id.* If an examination of the instrument involved dictates the conclusion that it actually would be considered stock under local law,[3] the provisions of section 1371(a)(4) may be held applicable and the benefits of subchapter S forfeited. In this context, the mere presence of a 3-percent interest element, with respect to a large portion of Allison's advances, is not enough to turn the tide in respondent's favor.[4]

---

[3] See *James L. Stinnett, Jr.*, 54 T.C. at 232; Fla. Stat. Ann., sec. 608.14 (1953).

[4] We note with interest that, among the proposals made by the Treasury Department in connection with the Tax Reform Act of 1969, was one which would have made clear that the "advances" involved herein should not be considered a second class of stock for subchapter S purposes. The proposal was explained as follows:

"The major difficulty under current law is the possible loss of qualification when a purported debt interest is determined to represent an equity investment for tax purposes. The regulations originally provided that if an instrument purporting to be a debt obligation were actually stock, it would be considered a second class of stock. This was later changed to provide the current rule that if the purported debt obligations are owned in the same proportion as the nominal stock, they will not be considered a second class of stock. However, the danger of disqualification remains when the "debt" interest is not proportional. This risk would be eliminated under the proposal.

"Under the proposal the existence of any interest not designated as stock, which has neither voting rights nor rights to distributions beyond a fixed annual interest rate and a fixed amount upon redemption or payment, will not cause the corporation to be disqualified even if the interest is determined to be equity capital."

See Joint Staff of House Committee on Ways and Means and Senate Committee on Finance, 91st Cong., 1st Sess., Tax Reform Studies and Proposals, U.S. Treasury Department, part 2, p. 275 (Comm. Print 1969).

The proposals were not included in the Tax Reform Act of 1969 due to their length and complexity. See Note "An Approach to Legislative Revision of Subchapter S," 26 Tax L. Rev. 800 (May 1971).

We see no reason to depart from the views which we expressed in *James L. Stinnett, Jr., supra.* Section 1371(a)(4) was intended by Congress as a shield to be used by respondent to protect himself from allocation tangles where several classes of actual shareholders are involved (see *Portage Plastics Co.* v. *United States*, 301 F. Supp. 684, 693–694 (W.D. Wis. 1969)[5]) and not as a sword against the unwary who happen to run afoul of the rules applicable in the debt-equity arena.

Respondent's reliance on *Commissioner* v. *O.P.P. Holding Corp.*, 76 F.2d 11 (C.A. 2, 1935), and *Jewel Tea Co.* v. *United States*, 90 F.2d 451 (C.A. 2, 1937), is misplaced. Both cases involved the classic debt vs. equity area where the corporate taxpayer sought an ordinary deduction for "interest" payments on hybrid securities (*O.P.P. Holding Corp.*) or for premiums paid in redemption of "preferred stock" which the taxpayer argued actually constituted debt (*Jewel Tea Co.*). Moreover, in each instance, the court based its decision against the taxpayer on an examination of the terms of the instruments themselves. These decisions are consequently clearly distinguishable.

In order to reflect petitioners' concessions on other issues,

*Decision will be entered under Rule 50.*

---

[5] See Note, "Disproportionate Advances by Shareholders of Subchapter S Corporation and the One Class of Stock Requirement," 31 La. L. Rev. 510 (1971); Comment, "The One-Class-of-Stock Requirement of Subchapter S and the Invalidation of Treasury Regulation 1.1371–1(g)," 50 B.U. L. Rev. 577 (1970).