PORTAGE PLASTICS COMPANY, Inc.,
Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 71–1555.

United States Court of Appeals,
Seventh Circuit.

Argued April 26, 1972.

Decided July 18, 1972.

Rehearing Granted En Banc
Oct. 19, 1972.

Fred B. Ugast, Acting Asst. Atty. Gen., Meyer Rothwacks, Thomas L. Stapleton, William L. Goldman, Attys. Tax Div., U. S. Dept. of Justice, Washington, D. C., John O. Olson, U. S. Atty., Madison, Wis., for defendant-appellant.

James Urdan, Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS and SPRECHER, Circuit Judges, and LARAMORE,[*] Senior Judge.

LARAMORE, Senior Judge.

This is a Federal income tax case which presents an issue relevant to a great number of small business corporations which have elected, or may elect in the future, to be taxed under Subchapter S of the Internal Revenue Code of 1954.[1] It is an issue involving section 1371(a) (4) of said Code, together with Treasury Regulation § 1.1371–1(g), as amended by T.D. 6904, 1967–1 Cum.Bull. 219, the regulation promulgated to explain the Code section first noted. Furthermore, it is an issue which has been considered by district courts other than the one from which this appeal is taken, as well as an issue which has been dealt with by Tax Court cases. Those cases, all to be noted hereafter, have singularly decided the issue against the government's position. Nevertheless, upon the facts as presented in this case, we hold in favor of the government's position that Regulation § 1.1371–1(g) is a reasonable and consistent interpretation of Code section 1371(a) (4). We thereby reverse the decision of the trial court in this case, namely, the U. S. District Court for the Western District of Wisconsin, 301 F.Supp. 684 (1969).

The above-noted decision of the District Court held that plaintiff-appellee was entitled to a refund of $142,413.79 of Federal income taxes paid, together with interest thereon computed from the date of payment, as a refund of taxes paid by the plaintiff corporation for fiscal years ending 1961, 1962 and 1963. The taxes were paid after being assessed by the Internal Revenue Service upon the theory that plaintiff failed to qualify as a small business corporation within the meaning of section 1371(a) because, contrary to the specific requirement of section 1371(a) (4), plaintiff had in existence during the years in question more than one class of stock.[2] Having allegedly failed to qualify as a small business corporation, the government contended, and assessed accordingly, that plaintiff was subject to the corporate income tax which would have otherwise been paid had not plaintiff elected to be taxed pursuant to the special provisions of Subchapter S.

It is plaintiff's contention that it did *not* fail to qualify as a small business corporation because, first, it did not have more than one class of stock and, second, even if the evidences of an obligation owing are reclassified as repre-

---

[*] Senior Judge Don N. Laramore of the United States Court of Claims is sitting by designation.

1. Hereinafter, all references to Code provisions will be to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

2. Section 1371(a) provides: "(a) Small business corporation.—For purposes of this subchapter, the term 'small business corporation' means a domestic corporation which is not a member of an affiliated group (as defined in section 1504) and which does not—(1) have more than 10 shareholders; (2) have as a shareholder a person (other than an estate) who is not an individual; (3) have a nonresident alien as a shareholder; and (4) have more than one class of stock."

sentative of equity in the corporation, it is not a second class of stock within the meaning of section 1371(a) (4). The facts giving rise to this controversy are set forth in detail in the opinion of the lower court and since there is no dispute as to those facts, we shall repeat only that portion we feel necessary for an understanding of this opinion.

Plaintiff is a Wisconsin corporation with its principal place of business at Portage, Wisconsin. It kept its books according to the accrual method of accounting with a fiscal year for tax purposes ending May 31. It was originally organized as a corporation on June 1, 1957, following the purchase of assets from, and an assumption of certain liabilities of, Standard Container Corporation (Standard). Said purchase was made possible when the original organizers of plaintiff corporation paid in $10,000 in return for the authorized common stock of the plaintiff. The articles of incorporation originally authorized 1,000 shares of common stock with a par value of $10 per share. However, effective January 23, 1962, the articles were amended to provide for an increase of the authorized shares of common stock to 20,000 shares with the same $10 par value. At all times relevant hereto no other class or series of stock was authorized by plaintiff's articles of incorporation.

The original stockholders were William G. Hamilton, whose holdings are set forth below along with all other stockholders of plaintiff during the years 1957 through 1964,[3] Ann Hamilton Kirk and Eugene Palmbach. These three stockholders also comprised the

original Board of Directors until June 4, 1961 when Ann Hamilton Kirk was replaced by Armand Cimaroli. Note, however, that the two main characters in our story are yet to be named since they were not designated as stockholders or organizers of the plaintiff corporation. Nevertheless, on June 1, 1957, in exchange for certain instruments to be discussed hereafter, Elizabeth G. Berst and Sara Garnett agreed to advance to plaintiff the sum of $12,500 each. Said advances were made by Elizabeth G. Berst on June 1, 1957, in the amount of $8,500; on August 27, 1957, in the amount of $2,000, and on December 16, 1957, in the amount of $2,000. Sara Garnett fulfilled her part of the deal by advancing $5,000 on June 1, 1957, and $7,500 on December 4, 1957.

The above-noted instruments provided that the plaintiff was to pay Elizabeth G. Berst and Sara Garnett $12,500 each, payable at Portage, Wisconsin on June 1, 1962, with interest to be paid in the amount of five percent of plaintiff's net profits before taxes. In addition to the agreement evidenced by the written instruments, it was orally agreed that at the end of the 5-year period (June 1, 1962) either or both ladies could renew the June 1, 1957 instrument at her request for a period of similar duration. Pursuant to that agreement, the two instruments, on June 1, 1962, were renewed for an additional 5-year period. In June of 1963, however, Elizabeth and Sara exchanged the June 1, 1962 instruments for 245 shares each of the common stock of plaintiff. At no time relevant to this case did plaintiff unilaterally have the right to renew the instruments in question.

3. During the years 1957 through 1964 plaintiff's stock was held as follows:

| Shareholder | May 31, 1958 | May 31, 1959 | May 31, 1960 | May 31, 1961 | May 31, 1962 | May 31, 1963 | May 31, 1964 |
|---|---|---|---|---|---|---|---|
| William G. Hamilton | 800 | 800 | 700 | 700 | 2800 | 2800 | 2800 |
| Ann Hamilton Kirk | 100 | 100 | 100 | 100 | 400 | 400 | 400 |
| Eugene Palmbach | 100 | 100 | 100 | 100 | 400 | 400 | 400 |
| William Hamilton, Jr. | 0 | 0 | 100 | 100 | 400 | 400 | 400 |
| Armand Cimaroli | 0 | 0 | 0 | 0 | 400 | 400 | 400 |
| Elizabeth G. Berst | 0 | 0 | 0 | 0 | 0 | 0 | 245 |
| Sara Garnett | 0 | 0 | 0 | 0 | 0 | 0 | 245 |

Those instruments, in standard note form, did not provide, nor did any other agreement, oral or written, for the repayment of the amounts advanced in the event of default on payment of the so-called "interest." Nor was there established by plaintiff a sinking fund of any sort to provide for the retirement of the obligations within the time periods provided.

Also with reference to payment of those obligations Elizabeth G. Berst and Sara Garnett executed, in June of 1959, separate written agreements which subordinated all their rights pertaining to the instruments in favor of the City Bank of Portage for a period of one year. Also, Elizabeth and Sara, on February 8, 1962, and March 26, 1962, respectively, agreed to subordinate their rights under the instruments in favor of the First National Bank of Chicago.

The instruments in question were recorded as notes payable on the books of the corporation and were listed as long-term debts and notes payable on plaintiff's financial statements prepared by certified public accountants. The accrual and payment of those amounts characterized by plaintiff as "interest" were recorded on the books of the corporation in the accrued interest payable account. Those amounts paid are as follows: Both ladies received $957.87 in 1959; $4,916.05 in 1960; $4,737.31 in 1961; $3,323.79 in 1962; and $2,245.03 in 1963, for a total of $16,180.05 as a return on an investment of $12,500.

Thus, it is easily seen that with regard to the business conducted by plaintiff corporation, with the exception of the first year of operation, the plastics business proved to be quite a successful venture.[4] It did have, therefore, a relatively high debt to equity ratio during the years in question since plaintiff found it necessary to borrow funds to fulfill the increasing needs for capital to meet the demands of expansion. Nevertheless, plaintiff made no actual distributions with respect to its common stock during its fiscal years ending 1958 through 1961. In fiscal year 1962, however, plaintiff distributed a total of $40,000 and in fiscal year 1963 the aggregate amount of $36,000 was distributed. It appears that a primary reason for such distributions was to enable the shareholders to meet their tax obligations brought about as a result of plaintiff's timely election to be taxed pursuant to the provisions of Subchapter S of the Internal Revenue Code for its fiscal years ending in 1961, 1962 and 1963. It was this election, coupled with the existence of the described obligations of the corporation in favor of Elizabeth G. Berst and Sara Garnett, which raised the issue to be hereinafter discussed.

■■ The foregoing facts, taken almost verbatim from the lower court's opinion of Judge Doyle, *supra,* led to the conclusion by Judge Doyle that the obligations in question were not actually evidences of a debt owing by the corporation but were more closely akin to evidences of equity in the corporation. He reached this conclusion by applying the facts of this case to the established criteria in the tax law which are used to determine whether an instrument purporting to represent debt is in reality an instrument representing equity in the corporation. By using those standards Judge Doyle found that the instruments in question constituted "contributions to capital" rather than representing "loans" to the corporation. He went on to hold, however, that even though these instruments were evidence of contributions to capital, they did not constitute a second class of stock within the meaning of section 1371(a) (4). In our opinion,

---

4. Plaintiff's net profits for each year through its fiscal year ended May 31, 1964, were:

| Fiscal Year Ended | Net Profits |
|---|---|
| May 31, 1958 | $(13,485.08) |
| May 31, 1959 | 15,888.55 |
| May 31, 1960 | 44,692.15 |
| May 31, 1961 | 76,313.06 |
| May 31, 1962 | 64,389.99 |
| May 31, 1963 | 46,555.71 |
| May 31, 1964 | 67,496.88 |

Judge Doyle applied the proper criteria and reached the correct conclusion that the instruments in question were evidence of contributions to capital and, therefore, we have no dispute with that portion of his opinion and findings. Indeed, as we shall indicate hereafter, we are thoroughly in favor of using the approach taken by Judge Doyle in determining the question of whether an advance is a loan or a contribution to capital. We would not hesitate, however, to add that having decided the instruments were not evidences of a loan to the corporation they must be some kind of evidence of equity in the corporation and not merely "contributions to capital," where the circumstances warrant such a conclusion. In other words, we would not be reluctant to call these instruments "stock" as that is the term commonly used to designate an instrument which represents an interest in the equity of a corporation. This is especially true where the contributors do not hold any other instruments as evidence of an interest in the equity of the corporation. Having made such a designation we would then go on to consider whether the "stock," as reclassified, was a second class of stock within the meaning of section 1371(a) (4), just as Judge Doyle did. However, at this juncture we would differ with the lower court since it is our opinion that once the initial judicial determination has been made, the law, as set forth by section 1371(a) (4) and Treasury Regulation § 1.1371–1(g) answers the second question. In other words, we are of the opinion that there is no such thing as "non-stock equity," the creature of a conclusion that the evidences of a capital contribution are *not* stock, and, furthermore, we are of the opinion that Regulation § 1.1371–1(g) is a reasonable and consistent interpretation of section 1371(a) (4) when used properly. In this case the regulation in question, in our opinion, should have been followed since the lower court used relevant standards, for purposes of section 1371(a) (4), in determination of the true nature of the advances.

The lower court noted in its discussion of the advances to the plaintiff that the question of whether they represent debt or equity is essentially one of fact, 301 F.Supp. at 688. It was concluded from that assumption that "[t]he burden is upon the taxpayer to establish that the advances constitute loans," *supra* at 688–689, citing Sherwood Memorial Gardens, Inc. v. Commissioner of Internal Revenue, 350 F.2d 225, 228 (7th Cir. 1965); Arlington Park Jockey Club, Inc. v. Sauber, 262 F.2d 902, 905 (7th Cir. 1959). Therefore, adhering to the previous position taken by this circuit, we must be governed by the "clearly erroneous" rule when reviewing this portion of the lower court's findings. Charter Wire, Inc. v. United States, 309 F.2d 878 (7th Cir. 1962), cert. denied, 372 U.S. 965, 83 S.Ct. 1090, 10 L.Ed.2d 129 (1963).

 In our review we note that strongest emphasis in determination of the debt-equity question was placed upon the fact that the interest to be paid was a percentage of profits. We are also of the opinion that this factor is most persuasive in the resolution of the question. Suffice it to quote only a portion of the discussion set forth by the lower court in this case:

> [T]he essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event. [301 F. Supp. *supra* at 689, quoting Commissioner of Internal Revenue v. Meridian & Thirteen R. Co., 132 F.2d 182, 186 (7th Cir. 1942).]

In our opinion this quotation, together with other authority on the question, not only indicates that the lower court's initial inquiry and holding was not "clearly erroneous" but was, in fact, clearly correct.[5] The method of compensating

---

5. On this criterion for distinguishing debt from equity, *see also*, Gilbert v. Commissioner, 248 F.2d 399, 402 (2d Cir. 1957) where the court defined a debt as: "an

these ladies for their investment, as described, was not, however, the only factor which convinced the lower court that the advances were made as contributions to capital.

Other factors which were indicative of the capital nature of these advances were that on two separate occasions the instruments were subordinated to the rights of creditors of the corporation; there was no provision for acceleration of payment in case of default on the repayment of the obligations. Furthermore, the debt to equity ratio was comparatively high and the nature of the plastics business being somewhat marginal, any anticipated return on the investments made was speculative at best. *See,* Sherwood Memorial Gardens, Inc., *supra,* 350 F.2d at 229; Arlington Park Jockey Club, *supra* 262 F.2d at 905; *see also,* Plumb, The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal, 26 Tax L.Rev. 369, 431–432 (1971), at notes 342 and 348. These factors, when considered together with the fact that so-called "interest" was payable only out of net earnings before taxes, led the lower court to conclude that advances made were contributions to capital. As noted, we do not find this conclusion clearly erroneous and, indeed, we are of the opinion that the lower court was correct up to this point. The lower court presented more than adequate reasoning in its determination and conclusion concerning the debt versus equity question. Furthermore, the opinion of Judge Doyle sufficiently disposed of all arguments and authorities presented on behalf of plaintiff's assertion that the instruments did not represent an equity interest in the corporation, 301 F.Supp. at 690. However, having made the above-noted conclusion, Judge Doyle did not, as we would, extend that preliminary determination to its pertinent application. First, he was reluctant to say that the advances were anything more

than "contributions to capital" which led to his final conclusion that the advances, though representative of equity in the corporation, were not a second class of stock for purposes of section 1371(a)(4).

The approach taken by Judge Doyle to reach the ultimate conclusion centered mainly around the validity of Treasury Regulation § 1.1371–1(g), as amended. Various cases in other District Courts as well as the Tax Court were cited as informative on the issue but properly recognized as not being determinative because of the varying factual situations. Again, we must admit to a basic agreement with the lower court in that we also feel the true question to be that of the validity of Treasury Regulation § 1.1371–1(g). However, we must differ with the conclusion arrived at by Judge Doyle because, first of all and in our opinion, the question of whether a purported debt instrument is actually representative of an equity interest is a question quite relevant to corporations which have elected to be taxed under Subchapter S. Secondly, and more importantly, however, and herein lies the crucial difference between our holding and that of others in the area, we are of the opinion that the criteria heretofore developed to determine the question of debt versus equity can and should be used in the context of Subchapter S. Once this determination is made all of the problems heretofore expressed with reference to the regulation in question can be resolved.

For instance, probably the leading case in this area today is W. C. Gamman, 46 T.C. 1 (1966). That case was the first to deal directly with the Regulation § 1.1371–1(g), as it read prior to its amendment. Said regulation stated, in its pertinent part:

> If an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock.

---

unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in

interest payable regardless of the debtor's income or lack thereof."

**314**

The *Gamman* case advocated, while not actually so holding,[6] that the regulation as formulated was "too broad and places a restriction on the stockholders of electing corporations which was not intended by Congress." (*Gamman, supra* at 8). That case, which ultimately caused the regulation to be amended to include the exception for proportionate holdings,[7] also led to further concern with the regulation, even as amended. Such concern, we believe, was precipitated by the court's discussion of the test that had to be used to implement the objectionable last sentence of Regulation § 1.1371–1(g),[8] before its amendment. In other words, what concerned the court in *Gamman* was that since no test was established by the regulation to determine whether the purported debt obligation is actually equity, the test used had to be pursuant to the so-called "thin capitalization" doctrine.

The "thin capitalization" doctrine, noted the court, was established to prevent the avoidance of double taxation in the non-Subchapter S corporation situation by distributing corporate earnings in the form of interest when in reality the distributions were dividends on a capital investment. (*See Gamman, su-*

*pra* at 12). Therefore, noted the court, since no such problems exist in a Subchapter S corporation (since no tax is imposed at the corporate level) the test has no relevance and should not be used to determine whether or not purported debt obligations are actually stock for purposes of section 1371(a) (4). The reluctance to use this test has, in our opinion, cast undeserving doubt upon the regulation in question and cases subsequent to *Gamman* have followed the lead of that case in expressing doubt as to the validity of the Regulation.[9] However, in each and every case that reluctance is founded upon the belief that the "thin capitalization" doctrine does not provide the proper standards for use in determination of whether or not there is a second class of stock for purposes of section 1371(a) (4). It is with this assumption that we differ. Furthermore, once this reluctance is overcome, Regulation § 1.1371–1(g) is purged of its objectionable requirements.

■ In our opinion, while the "thin capitalization" doctrine connotes that the test to be used is one of considering merely the debt to equity ratio, it is, in application, a much broader test. Granted, it may have begun as a doc-

---

6. The case did not actually pass on the validity of Regulation § 1.1371–1(g) because the Tax Court found that the advances made by stockholders were contributions of additional capital which were reflected in the value of the common stock already held by the plaintiffs. *Gamman, supra* at 9.

7. Treasury Regulation § 1.1371–1(g) *now* reads as follows:
 " * * * Obligations which purport to represent debt but which actually represent equity capital will generally constitute a second class of stock. However, if such purported debt obligations are owned solely by the owners of the nominal stock of the corporation in substantially the same proportion as they own such nominal stock, such purported debt obligations will be treated as contributions to capital rather than a second class of stock. But, if an issuance, redemption, sale, or other transfer of nominal stock, or of purported debt obligations which actually repre-

sent equity capital, results in a change in a shareholder's proportionate share of nominal stock or his proportionate share of such purported debt, a new determination shall be made as to whether the corporation has more than one class of stock as of the time of such change."

8. That portion of Regulation § 1.1371–1(g) most seriously objected to was as follows: "If an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock; moreover, even in its amended form, *ibid*, this remains the objectionable portion."

9. Stinnett, Jr. et al., 54 T.C. 221 (1970); Brennan v. O'Donnell, 68–1 U.S.T.C. ¶ 9314, remanded on other grounds, 426 F.2d 218 (5th Cir. 1970), on remand, 322 F.Supp. 1069 (N.D.Ala.1971); Shores Realty Co. v. United States, 27 A.F.T.R.2d 679 (S.D.Fla.1971); Amory Cotton Oil Co. v. United States, 320 F. Supp. 951 (N.D.Miss.1970); Estate of William M. Allison, 57 T.C. 174 (1971).

trine which looked to reclassify debt as equity whenever the reality of the situation indicated a tax-avoidance scheme and that scheme was tipped-off by the corporation's debt to equity ratio. Nevertheless, the test today contains many more considerations or criteria than simply the debt to equity ratio. Such other considerations are, for example, subordination of priorities, interest out of profits, no fixed maturity date, provisions for repayment, declaration of the parties, remedies for default, and several others; see Plumb, The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal, *supra* at 404. Thus, we feel it is a mistake to say that the "thin capitalization" doctrine has been used to make the determination for Subchapter S purposes; the true test used, as was used in this case, is a separate application of relevant factors which have sometimes been grouped together under the heading of the "thin capitalization" doctrine. In reality, these factors can and should be used independently to establish whether or not the holders of the obligations enjoy any rights or interest different from and in preference to the holders of the nominal (authorized common) stock.[10] If there are these preferential rights or interests then the purported debt may be reclassified as equity, which in turn, according to Regulation §

1.1371–1(g) can be considered stock and, indeed, a *second class* of stock. In our opinion, this result dictated by the regulation in question, is thoroughly consistent with the statute and is not, in view of the purpose of the requirement, unreasonable or inconsistent. Thus, under the standards heretofore established for determining the validity of a regulation, we must hold in its favor. Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948):

> Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statute * * *.

The Regulation is valid, in our opinion, not only because it is reasonable and consistent, but because when used properly, *i. e.*, with the standards aimed at determining if any preferences exist, the regulation carries out the purpose for which section 1371(a) (4) was included. Said purpose, while not declared at the time of its final enactment in 1958,[11] was set forth in reference to similar provisions proposed in 1954. At that time, one of the desires relevant to the one class of stock requirement was explained by the statement that "no class of stock may be preferred over another as to either dividends, distributions, or voting rights." S.Rep. No. 1622, 83d Cong., 2d Sess., p. 453,[12] U.S.

---

10. See, Note, The One-Class-of-Stock Requirement of Subchapter S and the Invalidation of Treasury Regulation 1.1371–1(g), 50 B.U.L.R. 577 (1970); dissent of Judge Sterrett in Stinnett, Jr., 54 T.C. 221 at 236 (1970): Note, Disproportionate Advances By Shareholders of Subchapter S Corporation and the One Class of Stock Requirement, 31 La.L.R. 510 at 519 (1971); dissent of J. Raum in *Gamman; supra* at 13: *But cf*, Estate of William M. Allison, 57 T.C. 174, 179 (1971); *Stinnett, supra* at 234; and the concurring opinion of J. Withey in *Gamman, supra* at 12–13, all of which suggest a different test based on the state law definition of stock. *See also*, Joint Staff of House Committee on Ways and Means and Senate Committee on Finance, Tax Reform Studies and Proposals, 91st Cong., 1st Sess., U.S. Treasury Depart-

ment, part 2, page 271–275 (Comm.Print 1969); Note, "An Approach to Legislative Revision of Subchapter S," 26 Tax L.R. 799, 807 (1971) which suggest a third alternative test.

11. Subchapter S was added to the 1954 Code by the Technical Amendments Act of 1958, Public Law 85–866, 72 Stat. 1606, section 64.

12. While the lower court and most other references to the problem discussed have referred to the legislative history of the 1954 proposals to point out that the purpose for the requirement was to eliminate administrative complexities, see, *e. g.*, lower court's opinion, *supra;* McGaffey, The Requirement That a Subchapter S Corporation May Have Only One Class of Stock, 50 Marq.L.Rev. 365 (1966); *Gamman, supra, Stinnett, Jr., supra*, in

**316**

Code Cong. & Admin.News, p. 5097. Thus, to prevent such preference it seems only logical that a second class of stock should be prohibited because of inherent differences in rights and privileges. Therefore, when that prohibition can be avoided simply by calling stock something else, it is quite reasonable, in our opinion, to strike down that avoidance by looking to the realities of the arrangement. This can be done by the proper standards to determine the true nature of the purported debt. In this case we feel such standards were used and the instruments were quite properly reclassified as representative of an equity interest in the corporation. Therefore, we have no other alternative than to call the advances in question not only equity but also a second class of stock which, in turn, leads us to decide in favor of the government's position. However, before doing so it would be well to note again that we are quite aware of the Tax Court cases and other cases in other district courts (cited at Note 7) which would suggest a result *contra* to the one reached here. Nevertheless, we are of the opinion, as was Judge Doyle below, that since those cases are concerned with purported debt holders who also hold the nominal stock, as well as being concerned with the proportionality requirement of Regulation § 1.1371–1(g), they are not in point as to this case where the purported debt holders did not own any of the nominal stock and the proportionality question is not relevant.

In summation, we hold that because the true nature of the purported debt obligations is a relevant question for a corporation which has elected to be taxed under Subchapter S, it is not unreasonable or inconsistent with the statute to provide that "obligations which purport to represent debt but which actually represent equity capital will *generally* constitute a second class of stock," (Treas.Reg. § 1.1371–1(g), emphasis added) when that determination is made pursuant to relevant standards or criteria.[13] In this case relevant standards were used but the terms of the regulation were not followed. This, in our opinion, was erroneous because once it is decided that the Regulation § 1.1371–1(g) is valid, the ultimate conclusion drawn from the reclassification of purported debt by use of relevant criteria must be that there exists a second class of stock. In this case such a conclusion did not follow from the initial reclassification. We, therefore, reverse the result of the lower court and deny plaintiff's petition for a refund.

CUMMINGS, Circuit Judge (dissenting).

I agree with the lower court (301 F. Supp. 684, 692) that application of the

our opinion such administrative complexities will be most serious when there is unequal treatment of stockholders. *See,* Note, B.U.L.Rev., *supra* at 582–583; Note, Shareholder Lending and Tax Avoidance in the Subchapter S Corporation, 67 Colum.L.Rev. 495, 512–17 (1967).

13. As for any "uncertainties, inconsistencies, and confusion derived from the unceasing stream of cases involving the debt-equity dichotomy" (J. Featherston's concurring opinion in *Stinnett, Jr., supra*), we are in agreement with the author of the Note in 26 Tax L.Rev., *supra* at 808:

"The most attractive solution to this problem, in addition to a clarification of reclassification standards as mentioned above, lies not with the Congress or the Internal Revenue Service, but with Subchapter S Corporations themselves. The Service has a legitimate interest in distinguishing debt from equity, and in reclassification. Where reclassification does occur, it seems almost a foregone conclusion that disproportionately held debt will constitute a second class of stock, because it will have various preferences over the nominal stock, and should disqualify the corporation for the allocation reasons inherent in the qualification. It seems appropriate therefore for corporations themselves to be more careful with their debt. There will certainly be occasions when it is necessary to borrow from shareholders, particularly for new corporations which may have difficulty establishing credit. But such debt can be represented by unambiguous instruments which include, at least, a definite maturity date and reasonable interest provisions and on which prompt payments are made." [footnote omitted.]

traditional thin capitalization doctrine tests[1] for determining whether a purported loan should be treated as an equity contribution is not suited to determine whether "more than one class of stock" exists within the meaning of Internal Revenue Code of 1954, § 1371(a)(4).

The thin capitalization doctrine emerged to prevent improper tax avoidance through the use of debt rather than equity. It operates to reclassify as equity that which would otherwise constitute a contribution to capital but for a label of debt applied to gain an unintended tax benefit. In the normal corporate context, indebtedness instead of equity may be used to avoid corporate level taxation on earnings paid out as interest since interest payments are deductible.[2] Int.Rev.Code of 1954, § 163(a). It may be utilized so that a corporate distribution appears as a non-taxable or capital gain (if in excess of basis) repayment of principal where it would otherwise constitute a non-qualifying stock redemption giving rise to ordinary

income.[3] Int.Rev.Code of 1954, §§ 301(c), 302(d), 1232. Ostensible debt may be used so that in the event of adversity an ordinary loss bad debt deduction under Int.Rev.Code of 1954, § 166 is available.[4] Debt may be used to hedge against imposition of the accumulated earnings surtax.[5] Int.Rev.Code of 1954, § 531. Finally, a corporation may issue short-term debt obligations instead of stock in exchange for depreciable property in order to circumvent the non-recognition provisions of Int.Rev. Code of 1954, § 351 and thus acquire a stepped-up basis for the property.[6] Int. Rev.Code of 1954, § 362.

Because there is no tax at the corporate level for a Subchapter S corporation—the earnings and losses being passed through to the shareholders under Int.Rev.Code of 1954, §§ 1373 and 1374—the advantages of internal debt financing are largely removed, as the majority readily appears to concede. Of the possible tax avoidance prospects which the thin capitalization doctrine is designed to foreclose in the ordinary

1. Contrary to the majority's intimation, rejection of the thin capitalization doctrine for purposes of § 1371(a)(4) has not been based on a too narrow interpretation of that doctrine as connoting only a debt to equity ratio test. See Brennan v. O'Donnell, 322 F.Supp. 1069 (N.D.Ala. 1971); Estate of Allison, 57 T.C. 174 (1971); Shores Realty Co. v. United States, 27 A.F.T.R.2d 679 (S.D.Fla. 1971); Amory Cotton Oil Co. v. United States, 320 F.Supp. 951 (N.D.Miss.1970); H. R. Spinner Corp., 29 T.C.M. 462 (1970); James L. Stinnett, Jr., 54 T.C. 221 (1970); Comment, The One-Class-of-Stock Requirement of Subchapter S and the Invalidation of Treasury Regulation 1.1371–1(g), 50 B.U.L.Rev. 577, 578 n. 9 (1970); Note, Shareholder Lending and Tax Avoidance in the Subchapter S Corporation, 67 Colum.L.Rev. 495 n. 2 (1967); McGaffey, The Requirement that a Subchapter S Corporation May Have Only One Class of Stock, 50 Marq. L.Rev. 365, 373 n. 26 (1966) (hereinafter cited as McGaffey). Of course, as the first part of the majority opinion (with which I am in agreement) demonstrates, the court below considered all the pertinent tests of the thin capitalization doctrine.

2. See, e. g., Sherwood Memorial Gardens v. Commissioner, 350 F.2d 225 (7th Cir. 1965); Foresun, Inc. v. Commissioner, 348 F.2d 1006 (6th Cir. 1965); Wood Preserving Corp. of Baltimore, Inc. v. United States, 347 F.2d 117 (4th Cir. 1965); Montclair, Inc. v. Commissioner, 318 F.2d 38 (5th Cir. 1963).

3. See, e. g., Moughon v. Commissioner, 329 F.2d 399 (6th Cir. 1964); P.M. Finance Corp. v. Commissioner, 302 F.2d 786 (3d Cir. 1962); Gooding Amusement Co. v. Commissioner, 236 F.2d 159 (6th Cir. 1956).

4. See, e. g., United States v. Henderson, 375 F.2d 36 (5th Cir. 1967); Smith v. Commissioner, 370 F.2d 178 (6th Cir. 1966); Arlington Park Jockey Club, Inc. v. Sauber, 262 F.2d 902 (7th Cir. 1959).

5. See, e. g., Gazette Telegraph Co., 19 T.C. 692 (1953), affirmed, 209 F.2d 926 (10th Cir. 1954).

6. Cf. Turner v. Commissioner, 303 F.2d 94 (4th Cir. 1962); John W. Harrison, 24 T.C. 46 (1955), affirmed, 235 F.2d 587 (8th Cir.), certiorari denied, 352 U.S. 952, 77 S.Ct. 327, 1 L.Ed.2d 243 (1956).

corporation, only the benefit to be derived through the exchange of debt instruments for depreciable property and the benefit to be gained through distribution of pre-election, accumulated earnings and profits in the form of repayment of principal remain as possibilities in a Subchapter S format.[7] The former possibility is non-existent in this case because the debt instruments issued to Elizabeth G. Berst and Sara Garnett were tendered in exchange for monetary advances of $12,500 from each. 301 F. Supp. at 686. With respect to the latter potential for improper tax avoidance, the district court pointed out that although the corporate taxpayer did have accumulated earnings from a period prior to its election of Subchapter S status, neither Elizabeth G. Berst nor Sara Garnett attempted to gain a tax-free or capital gain redemption of her advance. What is more important for our purposes is the lower court's astute observation that

> "even if Elizabeth G. Berst and Sara Garnett had attempted to achieve a taxfree redemption of the advances, the dispute would not be one which directly involved the tax liability of plaintiff. In such a situation presumably the debt-equity tests would be applicable to determine whether the advances should be characterized as loans or contributions to capital for

the purpose of preventing Elizabeth G. Berst and Sara Garnett from gaining an unintended tax advantage." 301 F.Supp. at 693 n. 1.

The point deserves re-emphasis. To the extent that improper tax avoidance by use of the guise of debt is still possible in the Subchapter S context, the thin capitalization doctrine remains available to prevent the abuse. Where on the facts of a particular case the Commissioner shows that the taxpayer spuriously labeled an advance as debt in order to reap an improper tax benefit, the thin capitalization doctrine serves its intended purpose when it is invoked to deny the particular benefit wrongfully taken or claimed in the taxable years in question. However, when that doctrine is pressed into service as well to deny retroactively Subchapter S status to the corporation, it serves neither its intended purpose nor, as will be shown, the purpose of Section 1371(a) (4). Denying Subchapter S status as a remedy for thin capitalization used to secure a particular advantage would seem wholly illogical and unwarranted as a measure to prevent tax avoidance,[8] for in the normal corporate setting only the claimed benefit is taken away. Much less would it be appropriate where, as here, characterization of the advances as debt was not shown to involve any element of tax avoidance at all.[9] Only if thin capi-

---

7. See Rosenkranz, Subchapter S—An Illusory Promise?, 6 Georgia L.Rev. 109, 117 n. 55 (1971) ; Comment, *supra* n. 1, 50 B.U.L.Rev. at 588 n. 73; Note, *supra*, n. 1, 67 Colum.L.Rev. at 501; McGaffey at 375–376; Caplin, Subchapter S and Its Effect on the Capitalization of Corporations, 13 Vand.L.Rev. 185, 191 (1959).

8. See Comment, *supra*, n. 1, 50 B.U.L. Rev. at 588–589; Note, *supra*, n. 1, 67 Colum.L.Rev. at 505, 509–512; Note, Debt Obligation of Subchapter S Corporation Held Not to Constitute Second Class of Stock, 41 N.Y.U.L.Rev. 1012, 1015–1017 (1966).

9. In addition to the traditional prospects for tax avoidance through the use of debt which survive in the Subchapter S context, Subchapter S provides several

peculiar opportunities for tax advantages to be derived through use of indebtedness. Of course, a distinction must be made between legitimate tax minimization through debt, the use of which Subchapter S provisions clearly contemplate (See Int.Rev. Code of 1954, § 1376), and tax avoidance. In the realm of possible tax avoidance, for example, debt may be utilized for income splitting among a family group, for avoiding the vulnerability of previously taxed but undistributed income to forfeiture of its taxfree withdrawal status (See Int.Rev.Code of 1954, § 1375(d) ; Treas.Reg. § 1.1375–4(a) and (e) (1969)), or for gaining additional net operating loss deductions when the basis of stock has been exhausted by previous loss deductions (See Int.Rev.Code of 1954, § 1374(c) (2)). See Caplin, *supra*, n. 7 at 190–194; Note, *supra*, n. 1, 67

talization gives rise to a second class of stock under Section 1371(a)(4) can the Subchapter S status itself be deemed forbidden fruit.

Since the prevention of tax avoidance —the *raison d'être* of the thin capitalization doctrine—offers no support for finding a reclassified debt to be a second class of stock, whether purported debt should be so characterized depends upon the purpose of Section 1371(a)(4). Needless to say, the Commissioner's semantic argument that reclassified debt must be denominated stock, and since different from the common shares, a second class of stock is singularly unpersuasive. One would have thought that long ago the law, even tax law, was freed from the rigors of such formalism. The only inquiry must be a functionally oriented one, engaged in with the realization that because a debt may be considered the equivalent of stock for one purpose it is not thereby the equivalent of stock for all other purposes.

The majority divines the purpose of the single class of stock requirement to be that "no class of stock * * * be preferred over another as to either dividends, distributions, or voting rights." This interpretation is, in my view, both untenable and unwarranted by the legislative history from which it seeks to derive support. As a matter of economic policy or in the interests of "equity," why would Congress want homogeneous treatment for all participants in a Subchapter S corporate venture? The majority does not inform us. To posit such legislative purpose without explanation is suspect since it is antithetical to the primary policy underlying the enactment of Subchapter S—"to permit businesses to select the form of business organization desired without the necessity of taking into account major differences in tax consequences." [10] Subchapter S was clearly designed to allow electing corporations to be treated for tax purposes more nearly like partnerships. [11] One of the hallmarks of partnership organization is the ability of the participants in the venture to differentiate among themselves with respect to their shares in earnings and losses, their distribution rights, and their power to steer the venture. Int.Rev.Code of 1954, § 704(a).

Colum.L.Rev. at 501–504. However, thwarting these tax avoidance schemes in no way necessitates finding a second class of stock. Reapportioning income and losses according to respective capital contributions is adequate to frustrate intra-family income splitting. See Note, *supra*, n. 1, 67 Colum.L.Rev. at 518–519; cf. McGaffey at 366–367. Although reclassifying debt as equity would effectively terminate any attempt to avoid the precariousness of previously taxed income through the "payout-loanback," since bona fide debt might be utilized in the same avoidance scheme, another remedy would seem more appropriate. It has been cogently suggested that where borrowed funds are substituted for previously taxed income, the simplest and most immediate remedy is to ignore the withdrawal of previously taxed income and treat the transaction as a distribution of corporate obligations giving rise to ordinary income to the extent of earnings and profits. See Treas.Reg. § 1.1373–1 (d) (1969); Note, *supra*, n. 1, 67 Colum. L.Rev. at 520–521; Caplin, *supra*, n. 7 at 194. In the rare case where a loan is advanced solely to gain a loss deduction, denial of the deduction is all that is needed to remedy the sham. What is more important, even where reclassifying the debt might be thought appropriate to thwart any particular tax avoidance scheme, equating the reclassified debt with a second class of stock so as to deny Subchapter S status is unwarranted. Simply put, such a measure would in no wise be remedial. In any case, suffice it to say that in the case at bar there is no suggestion that the loans of Elizabeth G. Berst and Sara Garnett accomplished or were designed to accomplish any possible tax avoidance peculiarly available within the confines of Subchapter S.

10. S.Rep.No.1983, 85th Cong., 2d Sess. 87 (1958); see S.Rep.No.830, 88th Cong., 2d Sess. 146 (1964).

11. See S.Rep.No.1622, 83d Cong., 2d Sess. 452–53 (1954), U.S.Code Cong. & Admin. News, p. 4629, the original bill which proposed precisely the partnership taxation format for electing corporations; Note, An Approach to Legislative Revision of Subchapter S, 26 Tax.L.Rev. 799, 800 (1971).

Why Congress in seeking to approximate partnership tax treatment would view one of the basic characteristics of the partnership format to be inherently bad from an economic or equitable point of view is not easily understood.

The 1958 Senate Report on which the majority relies reads as follows:

"The corporation may have only one class of stock outstanding. No class of stock may be preferred over another as to either dividends, distributions, or voting rights. If this requirement were not made, undistributed current earnings could not be taxed to the shareholders without great complications. In a year when preferred stock dividends were paid in an amount exceeding the corporation's current earnings, it would be possible for preferred shareholders to receive income previously taxed to the common shareholders, and the same earnings would be taxed twice unless a deduction for the earnings previously taxed were [sic] allowed to the common shareholders. Such an adjustment, however, would be extremely difficult where there had been a transfer of common stock in the interim."

S.Rep.No. 1622, 83d Cong., 2d Sess. 453–454 (1954), U.S.Code Cong. & Admin. News p. 5097.

By extracting the second sentence from its context, the majority ignores the real thrust of the Report. There is nothing intrinsically wrong with another class of stock, but its existence would cause administrative complexity in the allocation of income when preferred dividends were paid in excess of current earnings from undistributed but taxed prior earnings.[12] The lower court generally described the problem Congress envisioned as follows:

"Under § 1373(b) a shareholder of an electing small business corporation must include in his gross income the amount which he would have received as a dividend if there were distributed pro rata to the stockholders at the end

---

12. The Senate Finance Committee's Report on the Revenue Act of 1964, S.Rep. No. 830, 88th Cong., 2d Sess. 146 (1964), suggests the general administrative problem of allocating earnings and losses among various classes of stock as a possible rationale for the single class of stock requirement. No such problem inheres in the existence of a second class of stock which has a preference as to dividend or liquidation rights (so long as earnings are sufficient to cover dividends). See McGaffey at 368. Rather, the problem is caused by Sections 1373 and 1374 which provide for the pass-through of undistributed earnings or losses to the shareholders pro rata according to their holdings of the corporation's stock. If a preferential class of stock exists and one assumes that together with the common stock it is to be included in the class of stock to which the pass-through provisions apply, the pro rata allocation could present a formidable administrative problem of weighing differences between the types of stock. See Note, *supra*, n. 1, 67 Colum. L.Rev. at 515. (Of course, if one simply counts one share of preferred as the equivalent of one share of common (see Note, Disproportionate Advances by Shareholders of Subchapter S Corporation and the One Class of Stock Requirement, 31 Louisiana L.Rev. 510, 516–518 (1971)), no problem is presented, but that procedure appears unsupportable.) Given a single class of stock requirement, the pro rata allocation provisions make eminent administrative sense, but it is highly unlikely that the allocation problem identified above originally inspired the single class of stock requirement since excluding the preferred stock from the pro rata pass-through provisions, taxing the preferred holder according to his specified right to income, would have obviated the problem. Moreover, no supports appears for the proposition that the pro rata taxing scheme emerged as a matter of economic policy rather than simply as the logical administrative concomitant of a single class of stock. Notably, the legislative history contemporaneous with Congress' original consideration of the single class of stock requirement is devoid of reference to this problem, and the 1964 Senate Report is retrospective. In any event, the lower court considered this possible problem of allocation among different classes of stock and correctly observed the problem is non-existent so long as debt is treated as debt. 301 F.Supp. at 693.

of the taxable year an amount equal to the corporation's undistributed taxable income for the year. 'Undistributed taxable income' is defined by § 1373(c) as taxable income less the tax imposed by § 1378(a) and less the amount of money distributed as dividends during the taxable year. Where dividends in excess of earnings are distributed to the preferred stockholders, an inequity to the common stockholders results. The common stockholders have already been taxed on the amounts distributed to the preferred stockholders in excess of earnings, since these amounts represent undistributed taxable income of the corporation in prior years. However, the common stockholder can only receive a capital loss benefit for his part of the previously taxed income. Section 1376(a). Some sort of refund mechanism would, therefore, be necessary to prevent inequity to the common stockholder in such circumstances." 301 F.Supp. at 693.

Since interest on indebtedness is deductible in calculating the corporation's net taxable income and since in a year in which the interest payment exceeds earnings, the net operating loss is passed through to the shareholders, the above problem is not encountered with debt, whether held by the shareholders proportionately or disproportionately or held by outsiders—so long as interest is treated as interest. That is, since the shareholders are permitted a deduction for the excess of interest payments over earnings, they are adequately compensated for having been previously taxed on the earnings out of which the interest payments were later made, and no inequity which requires a special administrative refund mechanism exists. The Code already embodies an equalizing scheme when interest payments are made in excess of current earnings. Only if the interest payments are recharacterized as preferred dividends does the administrative problem occur, but, of course, justifying finding a second class of stock on this basis is specious since it assumes the conclusion at the outset.[13] Thus debt in a thinly capitalized Subchapter S corporation does not itself create the administrative complexity Congress intended to avoid.

However, even if there were an independent reason to call the interest payment a dividend, as the lower court pointed out, the administrative problem envisioned by Congress could not arise in the case at bar since

"the 'interest' on the advances is to be paid only out of net profits before taxes. Where the 'interest' payments are made in the year in which they accrue, the only difficulty presented is one of characterizing the 'interest' payments. Whatever the characterization, however, no administrative problem is presented. If the 'interest' payments are characterized as interest, the amount of the interest is not part of the taxable income of the corporation. If, on the other hand, the 'interest' payments are characterized as dividends, the amount of the dividends is not part of the 'undistributed taxable income' of the corporation within the meaning of § 1373(b)." 301 F.Supp. at 693–694.

---

13. It may be argued that where there has been a partial transfer of stock, a problem occurs even if the debt is not first reclassified. That is, since a shareholder's share of previously taxed but undistributed income is not reduced by a partial transfer of his holdings (Treas.Reg. § 1.1375–4(e) (1969)), to the extent of the shares he no longer owns, a net operating loss deduction for interest paid in excess of earnings will be lost. Int.Rev. Code of 1954, § 1374(c) ; Treas.Reg. § 1.1374–1(b) (1969). If this is a problem (see Note, *supra*, n. 1, 67 Colum.L.Rev. at 513–514), the argument proves too much since the same problem exists in the case of bona fide debt as it would in the case of debt which would be reclassified under thin capitalization tests. See *id.* ; Note, Debt Obligation of Subchapter S Capitalization Held Not to Constitute Second Class of Stock, 41 N.Y.U.L.Rev. 1012, 1017–1019 (1966).

In summary it is my view, the studied view of the lower court, the view of the other courts which have addressed the issue of late,[14] as well as the view of the commentators[15] that the purpose of Section 1371(a) (4) was not to require a homogeneity among risk capital investors based on notions of equity or economic policy, but rather to sidestep the particular administrative problem created by the payment of dividends to preferred shareholders in excess of current earnings. This problem is not created if the Commissioner would simply accept taxpayer's denomination of the advances as loans. Because Congress so clearly intended Subchapter S to "permit businesses to select the form of business organization desired without the necessity of taking into account major differences in tax consequences" (*supra* p. 319), and additionally because a contrary result is unduly harsh[16] and involves in Subchapter S election an element of risk I cannot believe it was intended to involve,[17] the single class of stock "requirement should not be unnecessarily expanded beyond the area dealing with the technical problem of allocation of earnings."[18] Utilizing the thin capitalization doctrine, which remains viable to thwart tax avoidance, to determine compliance with Section 1371(a) (4) is just such an unnecessary expansion. Insofar as Treas.

Reg. § 1.1371–1(g) (1969) sanctions this, it is "out of harmony with the statute" and unreasonable. Manhattan General Equipment v. Commissioner, 297 U. S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936). Therefore, I would affirm.

14. See Brennan v. O'Donnell, 322 F.Supp. 1069 (N.D.Ala.1971) ; Estate of Allison, 57 T.C. 174 (1971) ; Amory Cotton Oil Co. v. United States, 320 F.Supp. 951 (N.D.Miss.1970) ; cf. James L. Stinnett, Jr., 54 T.C. 221 (1970).

15. See Note, *supra*, n. 12, 31 Louisiana L. Rev. at 511–514 ; Rosenkranz, *supra*, n. 7 at 114–118 ; Comment, *supra*, n. 1, 50 B.U.L.Rev. at 581–584 ; Note, *supra*, n. 1, 67 Colum.L.Rev. at 513–517 ; McGaffey at 366–370 ; Note, *supra*, n. 13, 41 N.Y.U.L.Rev. at 1018.

16. A determination that the corporation is disqualified from electing Subchapter S treatment retroactively subjects the corporation to corporate level tax for the years in question. Although in the instant case the taxpayer retained substantial amounts of earnings apparently to meet the requirements of rapid expansion (301 F.Supp. at 687–688), normally a

Subchapter S corporation will distribute its entire earnings so that the shareholders will have money to pay taxes on their shares of the earnings (the primary reason for the taxpayer's 1962 and 1963 distributions here, 301 F.Supp. at 688) as well as for personal needs and so that the hazards to the taxfree withdrawal status of previously taxed income are avoided. See n. 9, *supra*. Normally then, a Subchapter S corporation would be in an unfavorable cash position to withstand retroactive corporate tax assessment since it probably would not have distributed as much earnings had corporate tax liability been known. See McGaffey at 365–366.

17. See James L. Stinnett, Jr., 54 T.C. 221, 235 (1970) (concurring opinion of Featherston, J.) ; Note, *supra*, n. 11 at 808 ; McGaffey at 379.

